37 Cal.3d 65 (1984)
688 P.2d 918
207 Cal. Rptr. 309
In re BABY GIRL M.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
EDWARD M., Defendant and Appellant.
Docket No. L.A. 31786.
Supreme Court of California.
October 22, 1984.
*67 COUNSEL
Joseph D'Addario, under appointment by the Court of Appeal, for Defendant and Appellant.
Lloyd M. Harmon, Jr., and Donald L. Clark, County Counsel, and Arlene Prater, Deputy County Counsel, for Plaintiff and Respondent.
Christian R. Van Deusen, John H. Larson, County Counsel (Los Angeles), Donald Byrne, Chief Deputy County Counsel, Sterling Honea and Thomas Tyrrell, Deputy County Counsel, and David Keene Leavitt as Amici Curiae on behalf of Plaintiff and Respondent.
OPINION
SONENSHINE, J.[*]
We are asked to determine whether the trial court erred in terminating a natural father's parental rights by considering only *68 the best interests of the child without first considering whether an award of custody to him would be detrimental to the child. We conclude Civil Code section 4600[1] is applicable to all section 7017, subdivision (d) termination proceedings and reverse the judgment.

I
Edward and Baby Girl M.'s mother dated during the fall of 1980. When the relationship ended in November, neither of them knew she was pregnant. Baby Girl M. was born on July 18, 1981. While in the hospital, the mother requested adoption assistance, met with a social worker, and placed the child in a foster home three days later. She had never informed Edward of the pregnancy and did not tell him of the birth until August 1, 1981.
Edward immediately contacted the San Diego Department of Social Welfare to determine his rights. He met with a social worker on August 5 and requested his daughter be placed with the family who was then providing day care for his sons. Later that day the mother formally relinquished the child for adoption and rejected Edward's placement request, stating she wished the child placed with a family neither of them knew.
On August 10 a section 7017 petition to terminate Edward's parental rights was filed. That same day Edward again met with the social worker, discovered the mother had relinquished the child for adoption, and expressed his fear he would be unable to see his child. He arranged to visit the child at the agency offices on August 17, at which time he specifically requested custody. Despite the father's wishes, Baby Girl M. was placed with the prospective adoptive parents on August 24.
At the section 7017 hearing in December, the court found Edward to be the biological father and "a good parent [who] can provide a good, loving home for this child." However, the court determined it was in the child's best interests to remain with the adoptive parents. Edward's parental rights were terminated without a finding it would be detrimental to the child to award him custody.

II
In 1976 the Uniform Parentage Act was enacted. (§§ 7000-7021.) One of its primary purposes, as well as that of several related statutes enacted simultaneously, was to eliminate the distinctions between legitimate and illegitimate children. To this end, the act declares the parent-child relationship *69 extends to every child and every parent, regardless of the marital status of the parents (§ 7002), and sets forth various procedures by which the relationship of parent and child may be established. (§§ 7006, 7015.) In addition, it gives the natural father a right he did not previously possess: the right to notice of the hearing to terminate his parental rights. (§ 7017, subds. (b), (d), (f).)
No adoption may be completed, even after a mother has relinquished the child, until a section 7017[2] petition is granted terminating the natural father's rights. Absent his prior written waiver, he is entitled to notice of the hearing. If he appears and "claims custodial rights, the court shall proceed to determine ... custodial rights...." (§ 7017, subd. (d), italics added.)
The Legislature, however, when it enacted sections 7000 et seq., did not specify the standard to be employed in a section 7017, subdivision (d) proceeding. (1a) Our analysis of statutory and decisional authority, recent legislative history, and public policy leads us to conclude the section 4600 detriment standard applies to a section 7017 custody hearing.
Section 4600[3] was enacted in 1969 as part of the Family Law Act. It sets forth a mandate that custody of a child in a dissolution proceeding could *70 not be awarded to nonparents without both parents' consent or a finding "that an award of custody to a parent would be detrimental to the child...."
(2) In In re B.G. (1974) 11 Cal.3d 679 [114 Cal. Rptr. 444, 523 P.2d 244], this court analyzed the legislative history of section 4600 and concluded "[a]s enacted, section 4600 expressly recognizes that custody should be awarded to parents in preference to nonparents. As between parents, it permits the court to award custody `according to the best interests of the child,' but in a dispute between a parent and a nonparent, the section imposes the additional stipulation that an award to the nonparent requires a finding that `an award of custody to a parent would be detrimental to the child.'" (Id., at p. 698.) "There can be no question of the desirability of a uniform rule; the Legislature's specification that section 4600 applies to `any proceeding where there is at issue the custody of a minor child' demonstrates that section 4600 was enacted to fulfill that objective." (Id., at p. 696, fns. omitted, italics added.)
The court in In re Reyna (1976) 55 Cal. App.3d 288 [126 Cal. Rptr. 138], relying on In re B.G., applied the section 4600 standard to facts similar to ours. An unwed father sought custody of his infant son after the mother relinquished the child for adoption. The court held "[b]ecause David asserts his entitlement to the physical custody of his child against the agency's claim to custody based on the mother's relinquishment, [section 4600] clearly applies." (Id., at p. 296.)
The Second District Court of Appeal recently decided In re Adoption of Baby Boy D. (1984) 159 Cal. App.3d 8 [205 Cal. Rptr. 361]. When a motion was made to terminate his parental rights, the unwed father sought custody. The court noted the issue was custody, not adoption. "So long as [the mother] does not assert her mother's right to physical custody, [the natural father] may not be denied custody of his child or have his parental rights terminated except upon finding that leaving custody with [the adoptive parents] is necessary to avert harm to the child." (Id., at p. 22.)
The Legislature, when it enacted section 7017, was aware of this court's decision in In re B.G. extending the section 4600 standard to proceedings outside the Family Law Act. If the Legislature did not wish the detriment standard to apply to section 7017, subdivision (d) custody proceedings, it *71 could have so indicated. (In re William Phyle (1947) 30 Cal.2d 838 [186 P.2d 134], Estate of Carson (1959) 174 Cal. App.2d 291 [344 P.2d 612], Estate of Fritz (1951) 102 Cal. App.2d 385 [227 P.2d 539].)
We are aware of the Legislature's enactment of Assembly Bill No. 649, vetoed by the Governor because he objected to certain financial provisions. Reintroduced as Assembly Bill No. 1782, and amended on January 17, 1984, the proposed statute again declared section 4600's parental preference would not apply to an alleged natural father seeking custody in a section 7017 hearing. However, this provision, as shown by a report on the bill to the Senate Committee on the Judiciary, was never considered by the Assembly Judiciary Committee, either as originally enacted or as reintroduced. The report stated: "AB 649 (McAlister) of 1983 contained a provision, identical to the one in AB 1782, applying the parental preference only to the presumed natural fathers. [¶] This provision was amended into both bills after they had left the Assembly Judiciary Committee. Thus it is once again being considered by only one policy committee. [¶] AB 649, which passed Senate Judiciary on a vote of 9-1, was heard when almost 80 other bills were on calendar." The report continues: "On November 18, the Select Committee on Children and Youth held an interim hearing on alleged and presumed fathers. This hearing was well attended by representatives from the Department of Social Services, adoption agencies, the academic community, and those interested in fathers' rights. [¶] The consensus of the witnesses was that the rights of alleged fathers are important and should be protected. [¶] This bill is contrary to that consensus." (Italics added.)
In a similar report on the bill, as amended February 23, 1984, the Senate Committee on the Judiciary confirmed the Legislature did not intend to deprive alleged natural fathers of the parental preference of Civil Code section 4600  "After lengthy debate the subject matter of this provision [denying alleged fathers section 4600 protection] was sent to interim, and the author agreed to amend it out of the bill." (Italics added.) Thus the Legislature has declined its opportunity to disprove application of the section 4600 standard to section 7017 hearings.
Our interpretation is also consistent with the public policy which led to the Uniform Parentage Act and other relevant civil code sections. Sections 221-230 set forth the mechanisms for adoption. Sections 232-240 contain the applicable law on freeing a minor from parental custody and control. Read together with the Uniform Parentage Act, the following statutory scheme emerges.
Under section 197, both mothers and presumed fathers[4] are entitled to custody of their minor children. An adoption can proceed only if their consent *72 has been given or their parental rights have been terminated pursuant to a section 232 or section 224 hearing. The mother and presumed father are equally entitled to the child's custody; therefore his consent is necessary before the child may be adopted.
However, if the father is merely a natural father[5] and not a presumed father, the mother alone is entitled to the child's custody. Only when the natural mother relinquishes the child for adoption do the natural father's rights commence. (§ 7017, subd. (d).) He is to be notified and his custodial rights, if claimed, determined before the adoption can proceed.
(3) The Legislature intended to differentiate between the veto powers accorded unwed mothers and presumed fathers on the one hand and natural fathers on the other. Application of the detriment standard does not defeat this policy. We do not find W.E.J. v. Superior Court (1979) 100 Cal. App.3d 303 [160 Cal. Rptr. 862] to the contrary. W.E.J. recognizes "... that, although the father was not a presumed father," he nevertheless was entitled to a hearing to determine his custodial rights. (Id., at p. 311.) Confusion arose when the court seemed to reject a detriment standard by inferring its use would be tantamount to a veto. We agree the natural father, unlike the presumed father, holds no automatic veto power over the adoption. It does not follow, however, that the use of the detriment standard would lead to such a veto power and we disapprove any language in W.E.J. to the contrary.[6] In the context of section 7017, the mother must *73 relinquish the child for adoption before the natural father has any rights. And once the child has been relinquished, we can foresee many instances where the trial court could find it was not only in the best interests of the child to terminate the father's parental rights, but it would be detrimental to the child not to do so. Then, as the natural and not the presumed father, his consent would be unnecessary and the adoption could proceed.

III
The major United States Supreme Court cases addressing cognizable interests of unwed fathers have involved situations where the fathers assumed full custodial responsibility or failed to pursue possibilities available to them. They either voluntarily ignored their rights or were precluded from ever exercising full custodial control because the mother had not relinquished the child. Both Stanley v. Illinois (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208][7] and Caban v. Mohammed (1979) 441 U.S. 380 [60 L.Ed.2d 297, 99 S.Ct. 1760][8] involved biological fathers who had established strong ties with the children and held them out as their own. Both would qualify in California as presumed fathers, entitled to custody. Both had taken the affirmative steps necessary to assume parental responsibilities. By contrast, in Quilloin v. Walcott (1978) 434 U.S. 246 [54 L.Ed.2d 511, 98 S.Ct. 549],[9] the father did not live with the child, offered only sporadic *74 support, and made no attempt to legitimate the child until it was 11 years old, when adoption was sought by the mother's husband. The court denied the legitimation petition by the natural father, who had declined to accept parental responsibility for 11 years and failed to avail himself of his statutory right to do so, on the ground of the best interests of the child. He had not requested custody. Under these circumstances, it is not difficult to assume the court could have also found it detrimental to the child to place her with the natural father. Additionally, in Quilloin, the mother retained custody and merely consented to her new husband's adoption request. Thus, no question arose of transferring custody from the only remaining parent.
Similarly, in Lehr v. Robertson (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985],[10] the mother remarried and the new husband sought to adopt. The biological father was not given notice of the adoption proceedings because he had not strictly complied with New York law by filing a claim with the putative father registry. Again, a statutory method of establishing a parent-child relationship was available but he took no action to utilize it.
The Supreme Court has not directly considered a fact situation similar to ours, where a mother has relinquished a newborn child and refused the father any contact. Thus the court has not addressed whether the natural father's parental rights may be terminated by only a best interests standard, or if a further finding of detriment is required.
We recognize our state scheme satisfies the procedural requirements of notice and opportunity to be heard. Thus, our holding is not based on any lack of federal due process. However, it is appropriate to note a recent law review article exploring the constitutional rights of unwed fathers. "Recognition of an opportunity interest in unwed fathers requires a conclusion that if the two elements of a constitutionally protected parent-child relationship are the biological link and commitment to and exercise of custodial responsibility, the state may not deny biological parents the opportunity to establish a protected custodial relationship." (Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson (1984) 45 Ohio State L.J. 313, 351.) This "opportunity interest" may, however, be lost where a parent voluntarily fails to pursue custodial responsibility or "the child's stepfather voluntarily assumes full custodial responsibility for the *75 child." (Id., at p. 368.)[11] The fitness or detriment standard is met in the first instance by effective abandonment; in the second, the father will never have an opportunity to seek custody.
However, in the absence of these factors, and where an adoption is sought by "strangers, the father's opportunity to establish a protected relationship must prevail in the absence of his unfitness." (Id., at p. 373.)

IV
We have held section 4600 applies to all parental custody proceedings involving a minor child. (In re B.G., supra, 11 Cal.3d 679.) Whether it now applies in section 7017 hearings should not be controlled by the context in which insemination occurs. The actions of both parents after the birth of their child determine their ability to accept parental responsibility. An unwed mother may have had no more desire to conceive or knowledge of the conception than the unwed father. Nevertheless she is given a choice to keep or relinquish the child because she gave birth. Her decision to release the child for adoption should not deprive the father of a meaningful opportunity to retain and develop his relationship.
A natural father may not have initial custodial or veto rights equal to those of a presumed father. However, both classes of fathers share the same burdens of support for the child and liability for the reasonable expenses of the mother's pregnancy and confinement. (§§ 7010 and 7012.) Thus when the natural father's rights do arise, upon relinquishment by the mother, and he claims custody at a section 7017 hearing, an additional finding of detriment is necessary to terminate his parental rights.

V
(1b) We have held the trial court erred by applying the best-interests-of-the-child standard without first determining whether granting custody to the natural father would be detrimental. A review of the evidence introduced at the hearing indicates a finding of detriment would have been unsupportable at that time. However, concerned, as we must be, with the child's welfare *76 and because of the passage of time, we recognize further evidence will be necessary.[12] The circumstances leading to the earlier determination should be reviewed in light of subsequent events. "[W]e recognize that during the pendency of this appeal, additional circumstances bearing on the best interests of the child(ren) herein may have developed. Any such circumstances may, of course, be considered by the trial court on remand." (In re Marriage of Carney (1979) 24 Cal.3d 725, 741 [157 Cal. Rptr. 383, 598 P.2d 36, 3 A.L.R. 4th 1028].)
We emphasize the section 7017 hearing is ancillary to the adoption, and while a condition precedent, it is not determinative. Adoptions can only be concluded after completion of the termination hearings and custody cannot, therefore, be determined by comparing the adoptive family and the father.
The judgment terminating the father's custodial rights is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.
Bird, C.J., Broussard, J., Reynoso, J., and Grodin, J., concurred.
MOSK, J.
I dissent.
At the outset I note serious omissions in the facts related in the majority opinion. The opinion fails to mention that on August 5, when Edward first met with the social worker, he informed her that he was not interested in obtaining custody of the child because he was the divorced father of two small boys, and the child was a female. He suggested that she be adopted by a family whose acquaintance he had made at his church. Nor did Edward express any desire for custody on his second visit with the social worker on August 10. It was not until later that he made his first request for custody. By this time, the child's mother had signed the consent for adoption, and the section 7017 petition had been filed. The evidence is in conflict as to whether the child had been placed in the adoptive home before or after Edward purportedly changed his mind and sought custody for himself.
As I point out, infra, the Legislature intended to differentiate between the rights of presumed fathers and natural fathers in a section 7017 proceeding. The holding of the majority makes no such distinction. The result of their opinion is to grant to a biological father, who may have had a single night's liaison with a stranger, who may not have known about the child's birth *77 until long after it occurred, and who may not have ever seen the child, the very same custodial rights in a section 7017 proceeding as are afforded to a father who was married to the mother for many years and lived with and supported his children emotionally and financially over a long period. There is no persuasive reason why the best interest of the child should not be a sufficient standard to test the custodial rights of a man who has had no relationship of any nature with a child other than biological.
The practical result of the holding of the majority is that in the future an unwed mother who elects to place her child for adoption in a stable environment with a two-parent family will refuse to relinquish custody whenever, as is commonly the case, she does not desire custody to be placed with the man who became a father as the result of a casual liaison and who has not formed any relationship with the child. In the present case, this scenario is more than theoretical. The mother signed the relinquishment only on condition that custody be transferred to the two-parent family chosen as adoptive parents. The social welfare department implied that it would permit her to withdraw her consent if this condition is not fulfilled.
Turning, then, to the legal flaw in the majority opinion I am of the view their conclusion that a natural father's right to custody may be terminated only if the court finds such an award would be detrimental to the child can only be reached by disregarding the critical provisions of section 7017. This is precisely what the majority cavalierly do. They do not attempt to explain or to rebut the impact of the crucial provisions of the section. The opinion simply makes no reference to the provision of subdivision (d) of section 7017[1] that if the man is a presumed father, his consent to adopt is required, whereas if he is not a presumed father "only the mother's consent shall be required for the adoption of the child."
The holding of the majority is inconsistent with the clear desire of the Legislature to differentiate between the rights of presumed and natural fathers in a section 7017 proceeding. They conclude that both presumed and natural fathers must be granted custody unless the court finds that such an award would be detrimental to the child. Why, then, did the Legislature direct the trial court must make a determination in that proceeding whether a man is a presumed or a natural father, and then provide that the question whether his consent to adoption is necessary shall be decided solely on the basis of the answer to this question?
The issues of whether a father must consent to an adoption and whether the detriment standard is employed in a section 7017 proceeding are inseparable. *78 The legislative direction that the natural father's consent is not required is another way of declaring that the court need not make a finding of detriment in order to free the child for adoption. Otherwise, there would be no difference between the custodial rights of presumed and biological fathers in a section 7017 proceeding. That is, a presumed father's consent to adoption is required under subdivision (d) and, as everyone concedes, he may not be deprived of custody absent his consent unless the court finds that such an award would be detrimental to the child. But inexplicably the majority apply this standard to the biological father's rights.
In effect, the majority have given the biological father the right to veto an adoption, in contravention of the Legislature's express direction to the contrary. It is inescapable that the application of the detriment standard to a natural father gives him the identical veto powers over an adoption and the same custodial rights as are granted to a presumed father under section 7017.
The majority concede that the Legislature "intended to differentiate between the veto powers accorded unwed mothers and presumed fathers on the one hand and natural fathers on the other" (maj. opn., ante, at p. 72), but their attempt to explain why this intent is not being violated here is patently untenable.
First, they state that "the natural father, unlike the presumed father, holds no automatic veto power over the adoption" because if the trial court finds that it would be detrimental to the child to allow custody to the natural father, then "as the natural and not the presumed father, his consent would be unnecessary and the adoption could proceed." (Maj. opn., ante, at p. 73.) But if a finding of detriment were made, the presumed father would also be denied custody, and for that matter the mother or any other person who sought custody would also be rejected. The majority strike out on that point.
Second, the majority declare that there is a distinction between the custodial rights of presumed and natural fathers in that before the mother relinquishes the child for adoption she and the presumed father have equal custodial rights (Civ. Code, § 197), whereas the natural father's right to custody, if any, does not arise until after the relinquishment. However, we are concerned here only with a section 7017 proceeding, which by definition does not occur until after relinquishment by the mother. It is in such a proceeding the Legislature has directed that a presumed father must consent to adoption, whereas a natural father's consent is not required. The majority's reliance on distinctions between the rights of natural and presumed fathers in other contexts is, therefore, unavailing.
*79 The legislative history of section 7017 strongly indicates that it was not the Legislature's intent to grant the identical custodial rights to biological and presumed fathers. An earlier version of the measure contained a provision that a natural father must be found unfit before a court could dispense with the requirement that he consent to an adoption. (Sen. Bill No. 347, as amended May 20, 1975, § 7023, subd. (d).) Later, the statute was amended to provide, as it does presently, that only the mother's consent is necessary for an adoption in the case of a father who is not classified as a presumed father. (Sen. Bill No. 347, as amended Aug. 12, 1975, § 7017, subd. (d).) While the circumstances under which the amendment was adopted are not clear, the elimination from the statute of the provision that a natural father must consent to an adoption unless he is found unfit demonstrates at the very least that at some point in the legislative process the right of a natural father to custody was considered and rejected.
Another indication of legislative intent appears from an analysis by the Assembly Judiciary Committee of Senate Bill No. 347, which contains the Uniform Parentage Act. This analysis, published in connection with the third reading of the measure, makes it clear beyond any doubt that the act does not grant any custodial rights to a natural father or require his consent for adoption. The analysis states, inter alia, that the measure abrogates "any right to custody whatsoever" in the natural father.[2]
Finally, in September 1983, the Legislature passed a statute which expressly declared that the provisions of section 4600 "relating to parental preference shall not apply to an alleged natural father seeking custody in an action brought pursuant to ... subdivision (d) of section 7017." (Assem. Bill No. 649 (1983 Reg.Sess.) § 6, subd. (h).) Although the Governor vetoed the measure because it contained certain financial provisions to which *80 he objected, in his message to the Assembly the Governor stated that he supported the substantive changes in the statute. (Governor's Press Release No. 504, Sept. 29, 1983.)
The majority's arguments based on legislative history following the veto of Assembly Bill No. 649 are less than convincing. It is incorrect to say, as do the majority, that because the author of a later bill decided to remove from the measure a provision that natural fathers would be granted section 4600 rights the "Senate Committee on the Judiciary confirmed the Legislature did not intend to deprive alleged natural fathers of the parental preference of Civil Code section 4600." (Maj. opn., ante, at p. 71, italics added.) The Legislature (as opposed to a single member of a legislative committee) made its intention clear beyond any doubt when it enacted Assembly Bill No. 649 in 1983 providing that the section 4600 standard did not apply to section 7017 proceedings.
Nor am I persuaded by the majority's reliance on the fact that In re B.G. (1974) 11 Cal.3d 679 [114 Cal. Rptr. 444, 523 P.2d 244], had been decided before the Uniform Parentage Act was adopted. From this, the majority draw the inference that the Legislature's failure to provide that the section 4600 standard did not apply raises an implication it intended to extend the parental preference doctrine to natural fathers.
Preliminarily, I note, that the majority also appear to rely on In re Reyna (1976) 55 Cal. App.3d 288 [126 Cal. Rptr. 138] for the same point, but Reyna was decided after the Uniform Parentage Act was passed, and therefore it cannot support their contention. (See fn. 5, at p. 304.)
The facts and background of In re B.G. are so different from the present case that the implication the majority draw from its holding is untenable. That case involved the rights of a mother whose children had been removed from her custody without her consent  a situation dramatically different from that involved here. The decision was filed and section 4600 became law, before the advent of the Uniform Parentage Act, and at a time when a natural father had virtually no right in his children. Such a father lacked not only the benefit of the parental preference doctrine (Deering's Civ. Code (1971 ed.) §§ 200, 224; Guardianship of Truschke (1965) 237 Cal. App.2d 75, 80 [46 Cal. Rptr. 601]; Adoption of Irby (1964) 226 Cal. App.2d 238, 241 [37 Cal. Rptr. 879]; Adoption of Laws (1962) 201 Cal. App.2d 494, 500 [20 Cal. Rptr. 64]; Darwin v. Ganger (1959) 174 Cal. App.2d 63, 70 [344 P.2d 353]), but there was no statutory provision which entitled him to notice of a pending adoption proceeding, and he had no right to be heard in such a proceeding. If the Legislature had intended by the enactment of section 7017 to grant to natural fathers rights equal to those of a presumed father, *81 a far more explicit reference would be required to justify such a radical departure from existing law.
More important, section 7017, subdivision (d), is inconsistent with section 4600, subdivision (c). While the former provides that the consent of the natural father to an adoption is not required, the latter states that a father's consent to the adoption is necessary unless the court makes a finding of detriment. As we point out above, if a biological father would be entitled to custody, absent a finding of detriment, his consent to the adoption would also be required. Thus, the Legislature, by providing in section 7017 that only the mother's consent is required if the child has no presumed father, determined that the parental preference rule stated in subdivision (c) of section 4600 does not apply to natural fathers. Simply stated, application of the parental preference rule here would directly violate the Legislature's mandate that the natural father's consent to an adoption is not required.
This conclusion is further supported by the fact that at the same time the Legislature enacted section 7017 (Stats. 1975, ch. 1244, § 11), it amended the provisions of the Civil Code relating to adoptions to provide that the consent of the mother and the presumed father is required for an adoption (Stats. 1975, ch. 1244, § 7). The majority would by their ipse dixit amend this provision to include the natural father.
The majority strain mightily to support their untenable result by an erroneous evaluation of United States Supreme Court decisions relating to natural fathers. It is impossible to read the court's opinion in Lehr v. Robertson (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985], and not recognize that due process requires nothing more than notification to the natural father that his rights may be terminated.
In Lehr, the natural father lived with the mother for two years, until the child's birth. He visited the mother and child in the hospital every day, but from the time of her discharge and for two years thereafter, the mother concealed the child's whereabouts from the father. During this period, the father never ceased his efforts to locate the child; he even hired a detective agency to find her. When he did find her, he visited the child as often as the mother would permit. He offered financial aid, and set up a trust fund for his daughter. The mother threatened the father with arrest if he persisted in his attempt to see the child. The father retained counsel, who promised legal action if the mother refused to allow visitation rights.
The mother remarried, and her new husband filed a petition to adopt the child. The natural father also filed an action in another county to establish visitation and paternal rights. Even though the court in the adoption proceeding *82 was aware of the paternity action, it granted the adoption petition. The United States Supreme Court upheld the decision on the ground that the natural father had failed to comply with a New York procedure to register his name with a "putative father registry."
The high court's opinion is replete with references to the effect that a biological father need not be granted the same rights as a presumed father. It observed that the "mere existence of a biological link does not merit equivalent constitutional protection" as is afforded to a father who participates in the rearing of his child (463 U.S. at p. 261 [77 L.Ed.2d at p. 626]) and that since the lower court was not terminating a developed relationship the natural father's rights were adequately protected by the notification provided by the "putative father registry."[3] For obvious reasons the majority make no reference to these matters; their attempt to distinguish the decision on the ground that it did not involve a newborn child who was refused contact with the natural father is transparently fallacious.[4] The implication of the majority that a natural father cannot be deprived of custody unless he voluntarily declines the opportunity to establish a relationship with his child cannot be harmonized with the decision in Lehr.
Case authority is consistent with my conclusion. W.E.J. v. Superior Court (1979) 100 Cal. App.3d 303 [160 Cal. Rptr. 862], recognizes that under the theory employed here by the majority the natural father would have a veto power over an adoption, contrary to the Legislature's intention. To the same effect is Adoption of Marie R. (1978) 79 Cal. App.3d 624 [145 Cal. Rptr. 122].
A number of cases involving the rights of natural fathers were decided on the basis of the law predating the Uniform Parentage Act. Since the provision of section 7017 that a natural father's consent to an adoption is not required was not yet in effect, they have no relevance in the interpretation of section 7017. (In re Reyna, supra, 55 Cal. App.3d 288; Adoption of Rebecca B. (1977) 68 Cal. App.3d 193 [137 Cal. Rptr. 100] [holding only *83 that the natural father was entitled to notice and hearing of a pending adoption, and may be entitled to custodial rights if an adoption proceeding is abandoned].) In re Lisa R. (1975) 13 Cal.3d 636 [119 Cal. Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017], involved an attempt by the natural father of a child with no living mother or presumed father to establish paternity; neither its holding nor its language is relevant to the present case.
Finally, even if the detriment standard is improperly applied in evaluating Edward's custodial rights, I would direct the trial court on remand to give substantial weight, in deciding whether it would be detrimental to award custody to Edward, to the circumstance that the child has been with the adoptive parents virtually all her life. Although the majority recognize the "dilemma" posed by the adoptive parents' custody (maj. opn., ante, at p. 76, fn. 12), they fail to give this emotional circumstance its appropriate effect.
A number of cases have recognized the trauma in removing a child from a settled home. In adoption proceedings this factor has been given determinative effect. (Adoption of Michelle T. (1975) 44 Cal. App.3d 699, 710 [117 Cal. Rptr. 856, 84 A.L.R.3d 654]; In re Volkland (1977) 74 Cal. App.3d 674, 679-680 [141 Cal. Rptr. 625]; Williams v. Neumann (Ky.App. 1966) 405 S.W.2d 556, 557; In re Adoption of Tachick (1973) 60 Wis.2d 540 [210 N.W.2d 865, 872-873].) Michelle T. quotes from the Williams case: "`[the petitioners have] attended every baby and childhood need and demand of [the child] from the fourth day of her life when she could neither focus her eyes nor raise her head. Up to this hour, according to this record, [she] has known no other mother as she has never seen her natural mother. She is now three and one-half years old and talking. She cannot be suddenly transplanted like a dogwood tree without running serious and dangerous risk of frustration and bewilderment.'" (44 Cal. App.3d at p. 707, italics omitted.)
In In re Reyna, supra, 55 Cal. App.3d 288, the court applied the detriment standard to the custodial rights of a natural father under procedures predating the Uniform Parentage Act. It recognized that on remand "if it is shown that it would be emotionally and psychologically harmful to uproot the child from the care and love of the nonparents with whom it has been living for a substantial period of time and place it with the father with whom it has never had contact, then custody must remain with the nonparents." (55 Cal. App.3d at p. 302.)
The majority, by not directing the trial court to give substantial weight to this factor, fail to take sufficient cognizance of the trauma of separation of this child from the secure home of the only parents she has ever known, to *84 be placed in the custody of a man she does not know and who originally rejected her. This callous result follows because the majority err by applying an inappropriate legal standard. In so doing they will cause untold disruption of the normal adoption process and serious damage to the valid social and humanitarian purposes orderly adoption procedures heretofore provided.
I would affirm the judgment.
Kaus, J., concurred.
NOTES
[*] Assigned by the Chairperson of the Judicial Council.
[1] All references are to the Civil Code unless otherwise indicated.
[2] Section 7017 provides in part: "(a)(1) If a mother relinquishes for or consents to or proposes to relinquish for or consent to the adoption of a child who has (1) a presumed father under subdivision (a) of Section 7004 ... the father shall be given notice of the adoption proceeding and have the rights provided under Chapter 2 (commencing with Section 221), Title 2, Part 3, Division 1 of the Civil Code, ... [¶] (b) If a mother relinquishes for, consents to, or proposes to relinquish for or consent to the adoption of a child who does not have (1) a presumed father under subdivision (a) of Section 7004 ... the agency or person to whom the child has been or is to be relinquished, or the mother or the person having custody of the child, shall file a petition in the superior court to terminate the parental rights of the father, unless the father's relationship to the child has been previously terminated or determined not to exist by a court, or unless the father has been served as prescribed in subdivision (f) with a written notice alleging that he is or could be the natural father of the child to be adopted or placed for adoption and has failed to bring an action for the purpose of declaring the existence of the father and child relationship pursuant to subdivision (c) of Section 7006 within 30 days of service of such notice or the birth of the child, whichever is later.... [¶] (d) If, after the inquiry, the natural father is identified to the satisfaction of the court, or if more than one man is identified as a possible father, each shall be given notice of the proceeding in accordance with subdivision (f), ... If any of them fails to appear or, if appearing, fails to claim custodial rights, his parental rights with reference to the child shall be terminated. If the natural father or a man representing himself to be the natural father, claims custodial rights, the court shall proceed to determine parentage and custodial rights in whatever order the court deems proper. If the court finds that the man representing himself to be the natural father is a presumed father under subdivision (a) of Section 7004, then the court shall issue an order providing that the father's consent shall be required for an adoption of the child. In all other cases, the court shall issue an order providing that only the mother's consent shall be required for the adoption of the child."
[3] Civil Code section 4600, subdivisions (a) and (c) provide in pertinent part "In any proceeding where there is at issue the custody of a minor child, the court may, .... make such order for the custody of the child during minority as may seem necessary or proper. [¶] Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child. ..." (Italics added.)
[4] Section 7004 provides in part: "(a) A man is presumed to be the natural father of a child if he meets the conditions as set forth in Section 621 of the Evidence Code or in any of the following subdivisions: [¶] (1) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation is entered by a court. [¶] (2) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and, [¶] (i) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce; or [¶] (ii) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation. [¶] (3) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and [¶] (i) With his consent, he is named as the child's father on the child's birth certificate, or [¶] (ii) He is obligated to support the child under a written voluntary promise or by court order. [¶] (4) He receives the child into his home and openly holds out the child as his natural child."
[5] A natural father is one who has been found to be the biological father but not a presumed father.
[6] We note an additional problem with applying W.E.J. in the present context. The hearing below in W.E.J. was an adoption proceeding, not a section 7017 hearing. As a result, its author was concerned because there was "no finding that the change of custody [from the prospective adoptive parents] was in the child's best interest." (Id., at pp. 306-307.) But the concerns voiced by the other justices illustrate there was no consensus on the appropriate standard to be applied. The dissent strongly supported application of the detriment standard enunciated in In re B.G., supra, 11 Cal.3d 679. The concurring opinion stated, "The trial court is directed (as it has not yet done) to consider, whether it will be adverse to the best interests of the child to give custody to the father." (Id., at p. 315.)
[7] In Stanley, the court concluded, "as a matter of due process," a father's parental rights could not be terminated without notice and "a hearing on his fitness as a parent...." (Id., at p. 649 [31 L.Ed.2d at p. 557].) The Stanley court held unconstitutional a statutory scheme which irrebuttably presumed all unwed fathers unfit.
[8] The court in Caban found a statute allowing unwed mothers, but not unwed fathers, to prevent adoptions, to be unconstitutional. The court concluded "this undifferentiated distinction between unwed mothers and unwed fathers, applicable in all circumstances where adoption of a child of theirs is at issue, does not bear a substantial relationship to the State's asserted interests." (Id., at p. 394 [60 L.Ed.2d at p. 308].) The court found no "profound difference between the affection and concern of mothers and fathers for their children" (id., at p. 392) and indicated "no showing" was made that allowing natural fathers the right to consent would "pose a strong impediment for adoption." (Id., at p. 392 [60 L.Ed.2d at p. 307].)

The Caban court, however, in two footnotes, specifically limited the application of its holding. In footnote 11, the court acknowledged the question of newborns was not at issue and reserved judgment. In footnote 16, the court stated: "Because we have ruled that the New York statute is unconstitutional under the Equal Protection Clause, we similarly express no view as to whether a State is constitutionally barred from ordering adoption in the absence of a determination that the parent whose rights are being terminated is unfit." (Id., at p. 394 [60 L.Ed.2d at p. 308].)
[9] A "father's interest in the `companionship, care, custody, and management' of his children is `cognizable and substantial,' [citation] and ... the State's interest in caring for the children is `de minimis' if the father is in fact a fit parent [citation]. Stanley left unresolved the degree of protection a State must afford to the rights of an unwed father ... in which the countervailing interests are more substantial." (Quilloin v. Walcott, supra, 434 U.S. 246, 248 [54 L.Ed.2d 511, 515].)
[10] In Lehr, the court found constitutional a statutory scheme requiring an unwed father to file a notice with a registry claiming paternity of a child born out of wedlock if he was to be entitled to notice of adoption proceedings. But again the court did not rule on the issue with which we are presented.
[11] In Adoption of Rebecca B. (1977) 68 Cal. App.3d 193, 198 [137 Cal. Rptr. 100], the court held only the mother's consent necessary for a stepparent adoption but found "... there inhere in the natural father certain residual rights in the child which cannot be terminated by adoption [citation] without notice and the opportunity to be heard. Until the child is adopted, the natural father of an illegitimate child is a parent within the meaning of section 4600 (In re Reyna, supra, 55 Cal. App.3d at p. 297 [126 Cal. Rptr. 138])." (Id., at p. 199.) "[S]ubsequent relinquishment of the child to an adoption agency by the mother (§ 224m), [constitutes a change] of circumstance which could lead to the acquisition of custody by the natural father." (Id., at p. 200.)
[12] We recognize the dilemma arising under the present fact situation. The state has placed the child with prospective adoptive parents pending resolution of Edward's claims; strong relationships have developed, and breaking those bonds could be harmful to the child.
[1] The only reference to these provisions is in the statute quoted in a footnote.
[2] A comment printed with the proposed act states: "In 1972, in Stanley v. Illinois, 92 S.Ct. 1208, the Supreme Court gave natural fathers an undelineated, ill-defined right to the custody of their children. According to the Assembly Judiciary Committee analysis, `No one can say with certainty the extent to which that right adheres, the circumstances under which the court can deprive a natural father of that right. In substance, at this point the court has asserted the existence of some right to custody in a natural father, but left the nature and extent of that right to conjecture. This bill seeks to settle the issue by abrogating any right to custody whatsoever unless the father has adopted the child (and become a presumed father) by receiving the child into his home and holding the child out as his natural child. Unless the father is a presumed father, the mother alone can consent to the child's adoption. Furthermore, while an alleged father must be given notice of an adoption proceeding, and is given the right to come into court and seek custody, there are absolutely no standards under which, if met, the court would be required to grant him custody. In fact, it is questionable whether the court has the authority to grant custody to the natural father. Any such authority must be implied from the fact that the father has the right to seek it. The bill does not contain a provision granting the court express authority to give custody to a non-presumed father. It is questionable whether in this respect the bill meets the constitutional standard of Stanley.'" (1975 Assem. File Analysis, microfiche ed., italics added.)
[3] The court characterized Stanley v. Illinois (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208], as holding that the "automatic destruction of the custodial relationship" rendered the statute there unconstitutional (463 U.S. at p. 259 [77 L.Ed.2d at p. 625]), quoted from the opinion of the dissenting justices in Caban v. Mohammed (1979) 441 U.S. 380 [60 L.Ed.2d 297, 99 S.Ct. 1760], which relied on the "clear distinction between a mere biological relationship and an actual relationship of parental responsibility," and distinguished these two cases from Lehr on the ground that they involved a "developed parent-child relationship" (463 U.S. at p. 261 [77 L.Ed.2d at p. 626]).
[4] The majority also attempt to distinguish Lehr on the ground that the father there had not attempted to file notice with the putative father registry. Such registration would only have provided notice similar to that set forth in section 7017 and would not have granted any custodial rights to the natural father.