[No. G000370. Fourth Dist., Div. Three. Dec. 17, 1984.]

GARDEN GROVE SANITARY DISTRICT, Plaintiffs and Appellants, v. COUNTY OF ORANGE, Defendants and Respondents.

COUNSEL

Rourke & Woodruff, James G. Rourke, Thomas L. Woodruff and Daniel K. Spradlin for Plaintiffs and Appellants.

Adrian Kuyper, County Counsel, and Benjamin P. DeMayo, Deputy County Counsel, for Defendants and Respondents.

OPINION

SONENSHINE, J.—In 1972, the Legislature enacted the Solid Waste Management and Resource Recovery Act (Act). (Gov. Code, § 66700 et seq.)[1] Due to population increases and technological advances in packaging, it declared the state's increased volume of solid waste was creating a threat to public health and the environment. (§ 66701.)

The Act required the county and board of supervisors to draft a Master Solid Waste Management Plan (SWMP) to "accomplish both of the following: [¶] (1) Identify and reserve sites for the establishment or expansion of solid waste facilities [¶] (2) Ensure that land uses adjacent to or near those sites are compatible with the solid waste facilities." (§ 66780.)[2] A State Solid Waste Management Board was established to develop state policy and approve and/or recommend improvements in local SWMPs submitted to it.

Under article 2 of the Act (dealing with SWMPs), the Legislature declared "that decisions involving the establishment or expansion of solid waste facilities should be guided by an effective planning process, including meaningful public and private solid waste industry participation."

---

[1]All statutory references are to the Government Code unless otherwise specified.

[2]"Each plan shall also include an analysis of the economic feasibility of the plan. . . ." (§ 66780.1.)

(§ 66780.) Thus, public hearings and informative meetings were required for the plan or any amendment thereto dealing with the *establishment* or *expansion* of solid waste facilities; each was subject to review and approval "by a majority of the cities within the county which contain a majority of the population of the incorporated area of the county, . . ." (§ 66780.1.)

However, no provision of the Act was to limit "[t]he power of a . . . county . . . to adopt and enforce regulations, not in conflict therewith, imposing conditions, restrictions, or limitations with respect to the handling or disposal of solid wastes." (§ 66732.)

Orange County's SWMP,[3] properly submitted to and approved by the affected cities, was given final approval by the state board in 1977. Chapter nine of the plan addressed economic feasibility, identifying the present short-term method of financing the plan and alternatives for the future.

The board of supervisors later commissioned a study of the county waste disposal system. The final report, received in June 1982, delineated the inadequacy of the present funding for operation of the county's solid waste disposal (county's general fund). The transfer stations, while capable of handling greater tonnage, were financially unable to meet the enlarged need. Long queues were an immediate problem and threatened to "become prohibitive with increased traffic volume."[4] All related activities such as future landfill site acquisition, equipment replacement, resource recovery facilities and other improvements were similarly endangered.

The report stated the general fund allocation was insufficient and "alternative financing needs must be considered . . . ."[5] On July 13, 1982, pur-

---

[3]The plan was developed by an advisory council made up of representatives from the local cities, districts, county agencies, civic groups and private industries, all concerned with some aspect of the plan.

[4]Transfer trailer loads were accepted until the budgetary quota per day was exhausted; the stations then closed.

[5]The report stated: "The present system has several negative effects.

"First, financing through the general fund results in an inequitable distribution of the cost of solid waste disposal in Orange County. Homeowners pay a disproportionately high share of the cost of disposal (through property taxes), while large industrial users (construction, demolition, retread tire companies, etc.) and commercial haulers utilize the facilities to a greater extent than the revenue they pay in property taxes. Thus, refuse disposal for these large users is being subsidized by homeowners.

"Second, because disposal is 'free', recycling and resource recovery efforts are not economically competitive with the present system and are thereby discouraged.

"Third, a system with no user fees does not encourage conservation of landfill capacity, an increasingly precious commodity. Transport of out-of-county refuse to county facilities is probably common, as is the disposal of demolition wastes at the Class II landfills. All these factors tend to increase the amount of refuse landfilled, thereby decreasing landfill life and accelerating the necessity of finding replacement sites."

suant to recommendations in the report, the board of supervisors imposed "gate fees at all landfills based on $7.00 per ton . . [and] $10.60 per ton at transfer stations, charges to begin in 90 days." (Resolution No. 82-1100.)[6]

Garden Grove and Midway City Sanitary Districts filed a complaint seeking a writ of mandate, a writ of administrative mandamus, declaratory relief and damages based on the county's alleged noncompliance with The Act. After the demurrers of the County of Orange and its board of supervisors were overruled, county and board filed a joint answer. Following a hearing, the petition for writ of mandate and application for preliminary injunction were denied. Upon stipulation by the parties that the court rule on the remaining causes of action in the complaint, judgment was entered for the county. This appeal followed.

Appellants, relying on section 66780.1, contend the Act prohibits imposition of gate fees unless implemented through an amendment[7] duly submitted to and approved by the affected cities. We disagree. Orange County's SWMP was sufficiently flexible to include adoption of user fees in 1982; statewide policy is not concerned with local fees as evidenced by provisions of the Act and subsequent actions by the state board and its chief executive officer; and statutes outside the Act specifically provide for compensation, collected by the Board of Supervisors, for operating costs.

## FLEXIBILITY OF THE ORANGE COUNTY PLAN

"[A]n analysis of the economic feasibility of the plan" was a required additive for the original SWMP (§ 66780.1) and "the plan [was to] be analyzed on a short-term, medium-term, and long-term basis." (Cal. Admin. Code, tit. 14, § 17137, subd. (a).) Specificity of costs and funding sources was necessary for the short-term plan but economic analysis for both medium-term and long-term periods need only be general. In fact, "[s]ufficient flexibility must be provided within the funding plan to encourage adoption of technological changes and response to economic conditions." (*Id.*, subd. (d).) Further, "[t]he methods and *sources of financing* the solid waste management program are a matter of local prerogative." (*Id.*, subd. (a), italics added.)

---

[6]Users pay a gate fee as they enter the site or "dump off" at the transfer station. The tonnage rates are applicable to commercial handlers while the general public is charged a flat fee.

[7]"'Amendment' means a written substantive change in the plan's text, data or appendices that has been approved by the County Board of Supervisors, the requisite number of incorporated cities, and the [state] board." (Cal. Admin. Code, tit. 14, § 17112.)

■ Orange County's original SWMP analyzed the short-term ("Present-1980") county funding as follows: "In recent years, land for disposal sites has been purchased with Revenue Sharing funds and operating costs have been paid from the County General Fund. Consideration has been given to User Fees at both the landfills and transfer stations, particularly the latter; however, they have never been imposed. [¶] Based on these historical facts, it is presumed that such a funding program will continue as long as Revenue Sharing funds are available. If and when they are discontinued, it can be assumed that the General Funds or some other financing method will be pursued."[8] Explicit medium-term financing (1980-1999) remained to be determined.

The final chapter addressed the flexibility of the funding plans: "if for any reason the present methods become inadequate or unsatisfactory, there are a number of alternatives, or combinations of alternatives, which could be utilized. Among them are: [¶] User Fees . . . ." Additionally, an attached graph of estimated expenditures for the medium-term clearly stated the method of financing would be "General Fund *or* user fees." (Italics added.)

Orange County's SWMP, approved by the cities and the state board, identified its short-term operation funding and adhered to that source throughout the term, although noting an alternate financing method might later be necessary. Funding sources, a matter of local prerogative (Cal. Admin. Code, tit. 14, § 17137, subd. (a)), were undetermined for the medium-term (*Ibid.* at subd. (c)); but when that term arrived and the original method became inadequate, sufficient flexibility was provided in the original SWMP to respond to changed economic conditions (*Ibid.* at subd. (d)) and allow for imposition of user fees pursuant to the first funding alternative under "Flexibility of Funding" and the attached graph.

### FEES ARE A MATTER OF LOCAL CONCERN

■ Standards included in the statewide policy concerned "the location, design, operation, maintenance, and ultimate reuse of solid waste processing or disposal facilities." (§ 66771.) The Act, however, specifically excludes state involvement in matters of local concern.

---

[8]Of interest is the terminology in this section. Revenue Sharing funds were used for the purchase of sites (whose identity, acquisition and establishment fall within the purview of statewide policy) while *operating costs* were paid from the general fund. Appellants place great weight on the second paragraph's presumption the stated funding program would continue. However, it there refers to the program drawing from *Revenue Sharing* funds, i.e., the purchase of disposal sites, *not* to operating costs.

Both parties expend a great deal of energy on section 66756: "Each county . . . city . . . which provides solid waste handling services shall provide for such services, including, but not limited to, collection, transfer, and disposal of solid waste . . . ." That section is contained in Chapter 1, Article 6, entitled "Solid Waste Handling by Local Agencies," which states the local agency may determine "[a]spects of solid waste handling which are of local concern including, but not limited to, frequency of collection, means of collection and transportation, level of services, *charges and fees,* . . ." (§ 66757, italics added.)

"Handling" is defined as "the collection, transportation, storage, transfer, or processing of solid wastes" (§ 66721), while "disposal" is "the final deposition of solid wastes onto land, into the atmosphere, or into the waters of the state." (§ 66720.) Appellants argue section 66757 authorizes *them* to charge fees for "handling" without approval of their residents, but the county, involved solely with "disposal," is not covered by the sections. The county, on the other hand, insists "disposal" is but an element of "handling" pursuant to section 66756: ". . . handling services . . . including . . . *disposal* . . . ." (Italics added.) While the latter argument is more persuasive, the county need not rely on these sections. Authorization for their fees is also found in Chapter 2 of the Act, dealing directly with solid waste management plans. It provides: "[S]tate policy . . . shall not include aspects of solid waste handling *or disposal* which are solely of local concern . . . such as . . . *charges and fees,* . . ." (§ 66771, italics added.)

The purpose of the SWMPs and their amendments is to provide "a comprehensive, coordinated solid waste management plan, *consistent with state policy* . . . ." (§ 66780.1.) Thus the imposition of gate fees does not require an amendment process: funding sources are a matter of local prerogative (Cal. Admin. Code, tit. 14, § 17137) and state policy concerns specifically exempt charges and fees for disposal. (§ 66771.)

THE STATE BOARD SANCTIONS IMPOSING FEES WITHOUT AN AMENDMENT

■ The periodic review required for each SWMP envisioned a report from the county to the state board indicating if and where the plan must be updated and in particular addressing: "(1) the adequacy of the data base, (2) the consistency with state policies, (3) economic changes, (4) the implementation schedule, (5) current and future administrative responsibilities, (6) changes in funding sources, (7) future facilities, (8) elements of the plan that were not implemented or successfully accomplished and why." (Cal. Admin. Code, tit. 14, § 17141 subd. (b).) The county, in its report, and/or the state board, after reviewing the report, determines if revision (requiring

an amendment) is necessary. A review and report is required every three years. (§ 66780.5 subd. (b).)

In 1980 a technical advisory committee was appointed for this purpose by the board of supervisors. Representatives of both the Garden Grove and Midway City Sanitary Districts were members of this committee. In its report to the state board no recommendations for revision were made. The state board's staff submitted a review of and comment on the county's report. Included was a description of the existing system in nine subparts (including "System Financing"). The staff recommended the report be accepted but that revisions be made in the following areas: resource recovery, enforcement and plan implementation. The staff report described the then existing funding and stated: "By July of 1982, the county is proposing to establish gate fees at the county solid waste facilities to help offset rising transfer and disposal costs." No revision was recommended to incorporate this avowed intention in either the staff report[9] or the state board's resolution of March 1981, accepting the county report, acknowledging the staff report, and following its recommendation. Thus, any changes made in funding sources were *informational* only.

A subsequent extension of time for revision was granted by the state board in recognition of the study ordered by the Board of Supervisors and the county's willingness "to expand the scope of the revision from the areas previously identified by the [State] Board to the transfer, disposal, solid waste financing, and solid waste administration elements of the plan." Appellants argue this language entitles them to an amendment process for a change in funding alone. We disagree. The changes in funding sources *already implemented* would merely be *reported* in the required revision (addressing resource recovery, enforcement and plan implementation). The reporting process is necessary to update the short-term period funding description under economic feasibility since by definition the review required every three years, if culminating in a revision, will have a *different* short-term period.

This view is further substantiated by the declaration of John W. Hagerty, executive officer of the state board, who stated he was familiar with the county's imposition of gate fees. He had informed the county prior to its gate fee resolution that "an amendment [to the SWMP] is not a necessary precondition to the imposition of gate fees," citing section 66771. The plan

---

[9]The staff report section dealing with resource recovery, noting items to be included in the revision of this plan element, suggested "[t]he county should explore using a portion of the proposed gate fee to finance initial planning and funding of resource recovery projects." Again, no mention is made of any necessity for revision or amendment to *impose* those fees.

revision then being undertaken by the county would "be required to contain an analysis of the economic feasibility of the plan and to include a *description* of the gate fee system *in effect at the time of the plan revision."* (Italics added.) There was however no necessity for an amendment to accomplish the gate fee system itself.[10] The same advice was tendered earlier by a member of the Attorney General's office on loan to the state board.[11]

### FEES MAY BE IMPOSED BY RESOLUTION OF THE LOCAL BOARD

■ Appellants insist section 25823, providing "[t]he board [of supervisors] may collect compensation from private or *public parties* for the right to dump or for the use of any dump site" (italics added), is in conflict with the Act to the extent it authorizes user fees absent compliance with the amendment process. We are convinced the Legislature had no intention of dictating sources of funding, either to the cities *or* the counties, or requiring an official amendment to the SWMP when alternate sources were found necessary. It was aware of the board's right to impose fees pursuant to section 25823 when it enacted section 66700 et seq. If it wished the amendment process to apply prior to imposing those fees it could have so indicated, either by specific mention in the Act or by amending section 25823. (*In re Baby Girl M.* (1984) 37 Cal.3d 65, 70-71 [207 Cal.Rptr. 309, 688 P.2d 918].) (See following division discussing the Legislature's amendment to section 6103, also addressing fees, to conform with the Act.)[12]

---

[10]He further declared the state board was aware the county planned to initiate the fees prior to the time it extended the county's revision deadline. No revision was ordered at that time because it was unnecessary.

[11]Appellants advert at length to the deposition of Don Poer, formerly director of the SWMP and identified by the county as the individual who would be testifying concerning the preparation of the SWMP and any amendments. Appellants claim it was Poer's opinion "the implementation of user fees as an alternative financing source would require an amendment to the 1975 [SWMP], which would have to be processed in the same manner as the original plan [including approval by the cities]." They overstate his authority to "bind" the respondents, apparently hoping his deposition answers are determinative on this issue. However, our perusal of the entire deposition indicates any opinion of Poer as to the necessity for an amendment process prior to the imposition of gate fees was merely his personal opinion. He specifically stated, "That had been my impression [in 1975] . . . [but at the present] I really don't have an opinion." In response to a later question, he replied, "As I noted earlier there was substantial study of this area in later 1980 and I think into early 1981, and I ceased to make my own personal interpretation of these things and tried to go by what County Counsel was advising us and what my superiors advised."

[12]Our conclusion is buttressed by the Legislature's enactment of section 25830 in 1972. That section, entitled "Fees for waste disposal sites and services," provides the board of supervisors may, by resolution or ordinance, establish fees to be imposed on unincorporated land for the operation and maintenance of county waste disposal sites. The county's actions relating to unincorporated land clearly will not impact the amendment process afforded to incorporated areas. However, those disposal service fees were considered and authorized by the Legislature *concurrently with the Act.* It chose not to amend or expunge the fee provision of section 25823, even though contained within the same short article of title 3. (Art. 2, "Disposal Facilities.")

### Cities Not Exempt From Payment

■ Lastly, appellants claim section 6103[13] exempts them from the payment of user fees. However, section 6103.11 specifically removes from the prohibition of section 6103 "any fee or charge for official services required by Title 7.3 (commencing with section 66700)." Appellants contend the exemption is not applicable because the gate fees were not imposed in compliance with the Act, i.e., by amendment, and thus not authorized or required by title 7. However, we have determined the gate fees *were* properly imposed by the county pursuant to resolution of the board of supervisors. The fees were contemplated within the economic feasibility of the original SWMP, specifically relegated to local prerogative, and thus authorized by the Act. Appellants are not exempt from payment.

The judgment is affirmed.

Trotter, P. J., and Wallin, J., concurred.

---

[13]Section 6103 provides in pertinent part: "Neither the state nor any county, city . . . shall pay or deposit any fee for the filing of any document or paper, for the performance of any official service, or for the filing of any stipulation or agreement which may constitute an appearance in any court by any other party to the stipulation or agreement. . . ."