[No. B146667. Second Dist., Div. Seven. Jan. 28, 2002.*]

In re JERRY P., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent, v.
J. R., Defendant and Appellant.

*Review granted May 1, 2002. Opinion directed to be published by the Supreme Court on June 6, 2002. On August 28, 2002, review dismissed and cause remanded to Court of Appeal, Second Appellate District, Division Seven. The Court of Appeal opinion is to remain published.

**COUNSEL**

Stephanie M. Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd W. Pellman, County Counsel, and Doraine F. Meyer, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**JOHNSON, Acting P. J.**—Jerry P. has been a dependent child of the juvenile court since shortly after his birth when both he and his mother tested positive for cocaine in their bloodstreams. The court initially found appellant, J.R., to be Jerry's "presumed father" and ordered father and son be provided family reunification services which eventually could lead to J.R.'s custody of Jerry.[1] Upon rehearing, however, the court determined J.R. could not be Jerry's "presumed father" because he never received Jerry "into his home" as required by Family Code section 7611, subdivision (d). The court did not address respondent's additional argument J.R. could not be the "presumed father" because DNA tests showed he is not the biological father.

J.R. appeals from the court's order denying him reunification services because he is not Jerry's statutorily "presumed father."

We reverse. ▪ We hold presumed fatherhood status, for purposes of dependency proceedings, is not necessarily negated by evidence the presumed father is not the biological father. We further hold *Adoption of Kelsey S.*[2] applies to dependency proceedings and therefore Family Code section 7611 and the related dependency scheme violate the constitutional rights of a man seeking presumed father status to the extent they permit a mother or third person to unilaterally deny him that status by preventing him from receiving the child into his home. Finally, we hold the constitutional protection afforded biological fathers under *Adoption of Kelsey S.* extends to men who are not biological fathers but who meet the other criteria for presumed father status under the *Adoption of Kelsey S.* decision.

### FACTS AND PROCEEDINGS BELOW

J.R. and Jerry's mother, Kiz, had a relationship for approximately a year. Jerry was conceived during this period. When J.R. learned Kiz was pregnant he assumed the baby was his and told others Kiz was pregnant with his child. J.R. eventually broke off his relationship with Kiz because she refused to stop using drugs despite J.R.'s warnings she was harming the baby. Notwithstanding their breakup, J.R. continued to provide support to Kiz. He supplied her with vitamin supplements and bus fare to go to the doctor, helped with prenatal care and paid for her medications.

---

[1]As we discuss more fully below, in dependency cases a man has "presumed father status" if he falls within one of the categories described in Family Code section 7611. Under subdivision (d) of the statute a man is a "presumed father" if "[h]e receives the child into his home and openly holds out the child as his natural child." A "presumed father," unlike a mere biological father, is entitled to reunification services with the dependent child and may be awarded custody. (Welf. & Inst. Code, § 361.5, subd. (a); *In re Zacharia D.* (1993) 6 Cal.4th 435, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751].)

[2]*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216].

Kiz called J.R. from the hospital and informed him she had commenced labor. Jerry was born the next day, and J.R. went to the hospital to visit him. He identified himself to hospital staff as Jerry's father and he was allowed to hold Jerry.[3] When J.R. returned the following day, Kiz had left the hospital but Jerry remained because he had tested positive for cocaine.[4] J.R. visited and held Jerry at the hospital every day for a week. When Jerry was a week old the hospital moved him to a different unit where J.R. could view him only through a window. Two days later, Jerry was gone. The hospital told J.R. only that Jerry had been placed with his mother's family. For four months J.R. tried unsuccessfully to find Jerry. He was unaware Jerry had been placed in a foster home and dependency proceedings initiated.[5]

J.R. testified he first learned of Jerry's whereabouts four months later when a social worker from the Los Angeles County Department of Children and Family Services (DCFS) contacted him, informed him the baby was in foster care and told him the date of the next scheduled dependency hearing was June 1, 1999. J.R. asked to visit Jerry and the social worker told him she would check and get back to him. Three months later the social worker gave J.R. the name and telephone number of Jerry's foster parents. J.R. immediately attempted to arrange visits with Jerry. The foster parents referred him back to the social worker and no visits were arranged prior to the next dependency hearing.

The June 1st hearing was a selection and implementation hearing under Welfare and Institutions Code section 366.26. J.R. appeared at the hearing and was appointed counsel. The court continued the hearing and ordered DCFS to explore J.R.'s presumed father status. The court subsequently ordered a paternity test to determine if J.R. was Jerry's biological father and continued the hearing on the matter. The matter was continued several more times and in the interim J.R. filed a petition requesting that he be given "presumed father status" and provided reunification services with Jerry with the intention of obtaining Jerry's custody.

On the issue of whether J.R. should be found to be Jerry's "presumed father" and afforded family reunification services, the court received the following evidence.

Since the June 1st hearing J.R. consistently visited with Jerry. The visits began as monitored, once a week, at the foster family agency or the DCFS

---

[3]No father was named on Jerry's birth certificate although Jerry bears J.R.'s last name. The birth certificate also gives J.R.'s date and state of birth.

[4]Kiz, whose six previous children were made dependents of the court, is not a factor in this case insofar as reunification and custody of Jerry are concerned.

[5]The court ruled J.R. had received constructive notice of the jurisdictional and dispositional hearings. Those rulings are not before us in this appeal.

office. After two weeks J.R. was allowed to visit Jerry at the foster parents' home once a week for two to four hours. When he came for visits, J.R. brought diapers, food and toys. He played with Jerry, talked to him and told him how much he loved him. J.R. also called the foster mother twice a week to check on Jerry's well-being.

Eventually J.R., Jerry and the foster mother would go on outings to a shopping mall or the park. The foster mother testified she was always present on these outings but she would allow J.R. and Jerry to go off on their own for awhile. When J.R. returned with Jerry the boy always appeared well cared for. Recalling the trips to the mall, the foster mother testified: "[J.R.] buys the baby something every minute of the day if you would let him. But [J.R.] goes every place and buys him something and the baby would have things under each arm." According to the foster mother, J.R. "is extremely dedicated to this child."

The social worker's report acknowledged: "Jerry has been having weekly visits with J.R. at the foster parents' home. According to the foster parent, these visits have been consistent since July 1999. Jerry appears to be in the elementary stages of bonding with *his father* and is secure and comfortable in *his father's* care." (Italics added.) The court also heard evidence that "at the beginning of each visit, [Jerry's] face brightens when [J.R.] arrives, and the minor appears happy during those visits [and] he cries at the end of each visit." Jerry calls J.R. "Daddy."

By April 2000, J.R. had completed classes in parenting and CPR. He had also completed the training for a foster care license but could not obtain one because he did not have his own residence.

The evidence showed during these proceedings J.R. for the most part resided at the Midnight Mission in Los Angeles where he was employed full time. The Midnight Mission facility where J.R. lived did not accept children as residents. However, it had another facility, near the home of the foster parents, which did accept families. J.R. had recently obtained private employment and was earning approximately $280 per week. His plan for accommodating Jerry, should he be awarded custody, was to retain Jerry in the child care program he was currently attending. The foster mother had agreed to assist J.R. with child care and J.R.'s mother was also available to assist if necessary. He would move to the Midnight Mission facility which accepts children or to private housing. J.R. acknowledged to the social worker Jerry had a bond with his foster parents and would have some difficulty coming to live with him. He stated "he was open to any services that would help."

J.R. told the court: "I am fully committed to the welfare of [Jerry]. I want what is best for him and will do whatever is necessary to ensure his emotional, physical and financial heath and safety."

DNA tests showed J.R. is not the biological father of Jerry.

A juvenile court referee conducted the initial hearing on presumed father status. The court heard argument from counsel for J.R., Jerry, and the foster parents, all of whom supported granting J.R. presumed father status. Only DCFS opposed presumed father status. It urged the court to rule against J.R. on the grounds he had not taken Jerry into his "home"[6] and was not the biological father. The court rejected the DCFS arguments. It ruled J.R. was the "presumed father" of Jerry and ordered family reunification services. The court gave the following explanation for its decision. "The code requires the father to receive the child into his home and openly hold out the child as his natural [child]. . . . He has visited regularly [and] clearly held himself out to be the father. . . . Regarding receiving the child into his home, I think that by going to the hospital every day on a daily basis was [*sic*] the equivalent of receiving the child into his home. . . . And it would seem to me that you should be able to reach the presumed [father] level without being a biological father."

DCFS immediately petitioned for a rehearing under Welfare and Institutions Code section 252. The petition was granted and the matter was heard de novo before a judge of the juvenile court.[7]

At the rehearing, the court took judicial notice of the contents of the file including the evidence and argument from the previous hearing. The court also accepted an offer of proof from J.R. which essentially summarized his evidence from the previous hearing. The court then heard argument from the parties on J.R.'s status as Jerry's presumed father. Each party took the same position it took in the original hearing with counsel for Jerry and the foster parents supporting J.R.'s presumed father status and DCFS opposing it.

This time, however, the court reached a different result. Finding J.R. had "not ever received the child into his home" the court denied J.R. presumed

---

[6]J.R. filed a declaration in which he stated: "Since May 2000, I have had [Jerry] in my care from Friday evening until Sunday afternoon." Although this statement implies J.R. had Jerry with him overnight on Saturdays and Sundays it does not specifically state J.R. brought Jerry into his "home" on those occasions. To the contrary, the foster mother testified J.R. never had unmonitored visits with Jerry. The case was argued on the premise J.R. never physically took Jerry to his home.

[7]When a matter is decided by a referee, Welfare and Institutions Code section 252 permits a minor, parent, guardian, or DCFS to request a rehearing before a judge of the juvenile court.

father status "for that reason alone." Having found J.R. did not meet a necessary requirement for presumed father status the court did not reach the question whether proof J.R. was not the biological father prevented him from being the "presumed father." The court remarked, however, "I think a hard and fast rule like that could lead to inappropriate results."

The court entered an order finding J.R. was not Jerry's presumed father and denying J.R.'s motion for family reunification services. The court set a new date for the selection and implementation hearing. J.R. filed a timely appeal.

DISCUSSION

I. *Statutory Background.*

In dependency proceedings, fathers are divided into four categories: de facto fathers, alleged fathers, natural fathers and presumed fathers. A man, such as a stepfather, who has assumed the role of parent, is a "de facto father."[8] A man who may be the father of the dependent child but has not been established to be the natural or presumed father is an "alleged father."[9] A man who has been established to be the biological father is a "natural father."[10] A man who has held the child out as his own and received the child into his home is a "presumed father."[11] A "natural father" can be, but is not necessarily, a "presumed father" and a "presumed father" can be, but is not necessarily, a "natural father."[12]

Presumed father status ranks highest. Only a "statutorily presumed father" is entitled to reunification services under Welfare and Institutions Code section 361.5, subdivision (a) and custody of his child under Welfare and Institutions Code section 361.2.[13]

Presumed fatherhood, for purposes of dependency proceedings, denotes one who "promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and

---

[8]*In re Crystal J.* (2001) 92 Cal.App.4th 186, 190 [111 Cal.Rptr.2d 646].

[9]*In re Zacharia D., supra,* 6 Cal.4th at page 449, footnote 15.

[10]*In re Zacharia D., supra,* 6 Cal.4th at page 449, footnote 15.

[11]Family Code section 7611, subdivision (d).

[12]*In re Zacharia D., supra,* 6 Cal.4th at page 450, footnote 18. Former Civil Code section 7004, referred to in *In re Zacharia D.* and other cases cited in this opinion, is now Family Code section 7611. The provisions applicable to presumed fathers are unchanged.

[13]*In re Zacharia D., supra,* 6 Cal.4th at page 451.

otherwise[.]"[14] As one court put it: "The purpose of reunification services is to 'reunite the family in a situation where the best interests of all concerned, the child, the parent and society as a whole, are well served.' " Therefore, "[w]e doubt, in light of the statutory purpose, that the Legislature intended to mandate reunification services solely based on the status of being the biological father. For example, we think it highly unlikely the Legislature intended to give a right of reunification services to a rapist or an anonymous sperm donor simply because the man is the biological father of the child."[15]

To identify fathers who, by reason of their parenting relationship, are entitled to seek reunification services and custody the Legislature borrowed the categories of men who are "presumed to be the natural father[s]" of children under Family Code section 7611,[16] hence the term "presumed father."[17] Section 7611 sets out a number of ways a father can obtain "presumed father" status.[18] He can marry or attempt to marry the child's mother, he and the mother can execute a declaration of paternity or he can "receive[] the child into his home and openly hold[] out the child as his natural child."[19] In the present case, J.R. attempted to qualify as a presumed father under the latter provision but the attempt failed because he could not prove he had "*physically* [brought] the child into his home."[20]

■ J.R. contends the scheme for determining presumed father status in dependency proceedings is unconstitutional insofar as it permits the mother or a third party unilaterally to preclude a man from becoming a presumed

---

[14]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 849.

[15]*In re Sarah C.* (1992) 8 Cal.App.4th 964, 975 [11 Cal.Rptr.2d 414].

[16]All further statutory references are to the Family Code unless otherwise noted.

[17]*In re Sarah C., supra,* 8 Cal.App.4th at page 972.

[18]Section 7611 provides in relevant part:

"A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with section 7540) [conclusive presumption as to child of marriage] or Chapter 3 (commencing with section 7570) of Part 2 [voluntary declaration of paternity] or in any of the following subdivisions:

"(a) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court.

"(b) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid . . . . [¶] . . . [¶]

"(c) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, . . . [¶] . . . [¶]

"(d) He receives the child into his home and openly holds out the child as his natural child."

[19]Section 7611, subdivision (d).

[20]*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051 [43 Cal.Rptr.2d 445, 898 P.2d 891, 61 A.L.R.5th 769].

father by preventing him from receiving the child into his home despite his demonstration of a full commitment to his parental responsibilities—emotional and financial and otherwise—before and after the child's birth. For the reasons explained below, we agree.

II. *Presumed Fatherhood Status Is Not Necessarily Rebutted by Evidence the "Presumed Father" Is Not the "Natural Father."*

■ Before addressing J.R.'s constitutional arguments we address a DCFS argument which, if correct, would render J.R.'s constitutional argument moot. DCFS contends even if J.R. initially could have been found to satisfy the requirements for "presumed father" status under section 7611 or its equivalent under *Kelsey S.* discussed in part III below, his presumed father status was negated by a subsequent blood test conclusively showing he is not Jerry's natural, i.e., biological, father.

DCFS relies on *In re Olivia H.* which held "presumed father" status in dependency proceedings can be negated by a blood test showing the "presumed father" is not the "natural father."[21] The court held blood tests establishing nonpaternity constituted "clear and convincing evidence" rebutting presumed fatherhood status under section 7612, subdivisions (a) and (c), (formerly Civ. Code, § 7004, subd. (b)) which state the presumption under section 7611 a man is a natural father " 'is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence' " or " 'by a court decree establishing paternity of the child by another man.' "[22]

We decline to follow the holding in *In re Olivia H.* for several reasons.

First, we disagree with the proposition lack of a biological relationship to the child *automatically* defeats presumed father status. As previously noted, section 7612, subdivision (a) states a presumption under section 7611 "*may* be rebutted *in an appropriate action* only by clear and convincing evidence." (Italics added.) In *In re Kiana A.*[23] the court interpreted this language as giving the trial court discretion to decide whether proof the "presumed father" is not the biological father is sufficient to rebut the presumption. The court explained: "[A]lthough the results of genetic testing constitute clear and convincing evidence, it does not follow that such evidence will rebut the presumption in every case. Rather, the statute seeks to protect presumptions of paternity, once they have arisen, from being set aside except upon clear

---

[21]*In re Olivia H.* (1987) 196 Cal.App.3d 325, 330 [241 Cal.Rptr. 792].
[22]*In re Olivia H., supra,* 196 Cal.App.3d at page 330.
[23]*In re Kiana A.* (2001) 93 Cal.App.4th 1109, 1115 [113 Cal.Rptr.2d 669].

and convincing evidence and only in an appropriate case."[24] Thus, in a case involving two men who met the statutory requirements for being a presumptive father, the court affirmed the trial court's decision to award presumptive father status to the man who had played a significant parenting role in the child's life as opposed to the man who was the child's biological father but had never played a part in her life.

Furthermore, we do not agree a finding that a man is not the biological father of the child is equivalent to "a judgment establishing paternity of the child by another man."[25] In our view, section 7612, subdivision (c) contemplates a situation in which a man of flesh and blood, as opposed to a mere hypothetical man, is put forward as the father of the child. Otherwise, a child could be precluded from having a loving, nurturing relationship with a committed father by a man the child may never even have met, who may be totally uninterested in the child and who cannot obtain presumed father status in his own right. We do not believe the Legislature intended to create such a dog-in-the-manger rule.

Finally, we question whether, in the dependency context, the courts should even treat "presumed fatherhood" as an evidentiary presumption.

The primary purpose of section 7611, a part of the Uniform Parentage Act, is to establish a child's paternity through a series of rebuttable presumptions.[26] In dependency proceedings, however, the purpose of section 7611 is not to establish paternity. Rather, as discussed above, the purpose is to determine whether the alleged father has demonstrated a sufficient commitment to his parental responsibilities to be afforded rights *not* afforded to natural fathers—the rights to reunification services and custody of the child. Therefore, in dependency proceedings the term "presumed father" does not denote a presumption of fatherhood in the evidentiary sense and presumed father status is not rebutted by evidence someone else is the natural father. The Supreme Court's decisions in *Adoption of Kelsey S.* and *In re Zacharia D.* and the statutory scheme itself support our conclusion.

Our Supreme Court has observed on several occasions presumed father status, when used to connote a father with financial and social ties to the

---

[24]*In re Kiana A., supra,* 93 Cal.App.4th at pages 1118-1119.

[25]Section 7612, subdivision (c). See *Comino v. Kelley* (1994) 25 Cal.App.4th 678, 686, footnote 10 [30 Cal.Rptr.2d 728], questioning but not deciding whether a negative blood test of one man is the equivalent of an affirmative judicial declaration of paternity by another man.

[26]*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 937 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (section 7611 creates a rebuttable presumption affecting the burden of proof in actions to establish paternity).

child, is unrelated to natural father status. In *Adoption of Kelsey S.* the court stated: "A man's parentage of a child may be undisputed and legally proven, but he may nevertheless fail to be a 'presumed father'. . . . Conversely, even if paternity is denied *and legally disproved*, a man may be deemed, under some circumstances, to be a 'presumed father.' "[27] Although *Adoption of Kelsey S.* was an adoption case, it relied on the same categories in section 7611 for determining presumed father status as are used in dependency cases. Moreover, in *In re Zacharia D.*, which was a dependency case, the court noted "it is possible for a man to achieve presumed father status, with its attendant rights and duties, without being the biological father."[28] The court's observations suggest in the dependency context the term "presumed father" is not an evidentiary term but a term of convenience used to identify a preferred class of fathers by reference to the familial bonds described in section 7611 which the Legislature has determined reasonably approximates the class of fathers it wishes to benefit.[29]

The conclusion presumptive fatherhood is not an evidentiary presumption in the dependency context is also clear from the fact that in dependency proceedings a "presumed father" has greater rights than a "natural father."[30] It would not make sense to use the categories in section 7611 simply to establish an evidentiary presumption a man is a "natural father" when being a "natural father" is a step *below* being a "presumed father."

Moreover, if the role of section 7611 in a dependency proceeding was merely to establish an evidentiary presumption a man was the child's natural father, a man who was already established to be the child's natural father before dependency proceedings commenced could never become a "presumed father" because a presumption under the statute would be unnecessary.[31] We fail to see the rationality in a system which would confer more rights on a father when his biological tie to the child is unknown than when it is.

---

[27]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 823, footnote 3, italics added.

[28]*In re Zacharia D., supra,* 6 Cal.4th at page 450, footnote 18. Although there is dictum in this footnote suggesting presumed father status in a dependency proceeding may be rebutted by blood tests establishing another man is the biological father, this issue was not before the court because the man who was not the natural father had terminated all reunification efforts with Zacharia and signed a statement relinquishing any claim he may have had to the child. (*Id.* at p. 441, fn. 3.)

[29]See *W. E. J. v. Superior Court* (1979) 100 Cal.App.3d 303, 308 [160 Cal.Rptr. 862], disapproved on other grounds in *In re Baby Girl M.* (1984) 37 Cal.3d 65, 72 [207 Cal.Rptr. 309, 688 P.2d 918] and in *Adoption of Kelsey S., supra,* 1 Cal.4th at page 849, footnote 13.

[30]*In re Zacharia D., supra,* 6 Cal.4th at page 449; and see discussion, *ante,* at page 803.

[31]See *In re Tricia M.* (1977) 74 Cal.App.3d 125, 132 [141 Cal.Rptr. 554].

III. *Section 7611 and the Related Dependency Scheme Violate the Guarantees of Due Process and Equal Protection to the Extent They Allow a Mother or Third Person Unilaterally to Preclude a Father from Becoming a "Presumed Father."*

A. *J.R. Satisfied the Requirement of Holding the Child Out as His Own.*

As previously noted, to qualify as a presumed father under section 7611, subdivision (d), a man must satisfy two requirements. He must hold out the child as his own and he must receive the child into his home.

In *Kelsey S.* the court recognized a man attempting to satisfy the "holding out" requirement for presumed father status "may have been restricted, both legally and as a practical matter, in his ability to act fully as a father." Nevertheless, the court stated, "the trial court must consider whether petitioner has done all that he could reasonably do *under the circumstances.*"[32] This means "[o]nce the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit." In particular, "the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' . . ." The trial court should also consider "the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child."[33]

The evidence in this case leaves no doubt J.R. established a father-son relationship with Jerry before his birth and that this relationship continued through the hearing on J.R.'s presumed father status.

From the beginning, J.R. held himself out as Jerry's father. J.R. believed the child was his and told others the mother was pregnant with his child. Even after he broke up with Jerry's mother because of her drug use J.R. supplied her with vitamin supplements, bus fare for doctor visits, helped with prenatal care and paid for the mother's medications. He was at the hospital when Jerry was born and identified himself to hospital staff as the father. He visited and held Jerry daily in the hospital. When Jerry was taken from the hospital without J.R.'s knowledge he spent months looking for him among the mother's relatives. Once he reestablished his connection with Jerry, J.R. never missed a visit, went with him on outings to the shopping mall and the park, provided him with food, diapers and toys and developed a bond with the child, who refers to him as "Daddy."

---

[32] *Adoption of Kelsey S., supra,* 1 Cal.4th at page 850.
[33] *Adoption of Kelsey S., supra,* 1 Cal.4th at page 849, citation and footnote omitted.

Without question, J.R. promptly came forward and demonstrated a full commitment to Jerry's welfare—emotional, financial and otherwise.

### B. J.R. Was Thwarted by the Mother and Third Parties in His Attempt to Satisfy the Requirement of Taking the Child into His Home.

In *Adoption of Kelsey S.* and *In re Zacharia D.* the Supreme Court recognized under section 7611, subdivision (d) a father who would become a "presumed father" does not have exclusive control over the means to achieve that status. No matter how loving, caring, giving and nurturing he is, control over a man's presumed father status ultimately rests with the mother,[34] or in some cases a third party.[35] This is because the mother cannot be forced to allow the father to take the child into his home.[36] In addition, there will be cases where the father cannot physically take the child into his home because, for example, the DCFS has taken custody of the child or the child, due to illness or birth defect, must remain in the hospital.

*Adoption of Kelsey S.*, an adoption case, addressed the constitutional problems which arise when a mother or third party unilaterally can prevent a man from attaining presumed father status. In adoption proceedings, like dependency proceedings, a man with presumed father status has rights superior to those of a man with mere natural father status. A natural father's consent to an adoption of his child by third parties is not required unless the father shows retention of his parental rights is in the child's best interest. Consent, however, *is* required from a mother and a presumed father regardless of the child's best interest, unless it is shown the mother or presumed father is unfit.[37] As a practical matter, the court noted, natural fathers almost never win out over the would-be adoptive parents. If the natural father is to have any realistic chance of retaining his relationship with his child he needs to qualify as a presumed father.[38]

In *Adoption of Kelsey S.*, the mother, Kari, gave birth to Kelsey whose undisputed natural father was Rickie M. Kari and Rickie never married and Rickie never physically took Kelsey into his home. Two days after Kelsey was born, Rickie filed a petition to establish his parental relationship with Kelsey and to obtain custody. About this same time Kari placed Kelsey with prospective adoptive parents. The trial court issued a temporary restraining

---

[34]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 847.

[35]*In re Zacharia D., supra,* 6 Cal.4th at page 451.

[36]The mother can block presumed fatherhood in other ways too. She cannot be forced to marry the father, nor can she be forced to sign a declaration of paternity. Here, however, we focus only on the requirement of taking the child into the father's home.

[37]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 825.

[38]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 824.

order awarding care, custody and control of Kelsey to Rickie. Rickie never took custody of Kelsey, however, because the prospective adoptive parents secretly removed him from their home. The issue of Rickie's temporary custody of Kelsey became moot a few days later when the court ordered Kelsey into the custody of his mother and prohibited visitation by either the prospective adoptive parents or Rickie. The court later amended its order to allow Rickie to visit Kelsey at the women's shelter where he was living with his mother.[39] In the subsequent adoption proceeding, the trial court ruled Rickie was not a presumed father because he had never taken Kelsey into his home.

The Supreme Court granted review to decide "whether a natural father's federal constitutional rights are violated if his child's mother is allowed to unilaterally preclude him from obtaining the same legal right as a presumed father to withhold his consent to his child's adoption by third parties."[40] The court held the statutory scheme for determining presumed father status "violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father[.]"[41]

The court viewed the adoption scheme as discriminating between biological mothers and biological fathers. Biological mothers had an absolute right to withhold consent to adoption. Biological fathers only had an absolute right to withhold consent to adoption if they were also presumed fathers. A mother, however, could preclude a father from attaining presumed father status by preventing him from taking the child into his home.

The court framed the issue in *Adoption of Kelsey S.* as whether "the state's important interest in the well being of a child born out of wedlock [is] substantially furthered by allowing the mother to deny the child's biological father an opportunity to form a relationship with the child that would give the father the same statutory rights as the mother (or a presumed father) in deciding whether the child will be adopted by third parties?"[42]

The court concluded there was a "lack of any substantial relationship between the state's interest in protecting a child and allowing the mother sole control over its destiny [by preventing] the father from obtaining presumed status[.]"[43]

In reaching this conclusion the court first pointed out there were only two ways a father could achieve presumed father status: through marriage to the

---

[39]*Adoption of Kelsey S., supra,* 1 Cal.4th at pages 821-822.
[40]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 830.
[41]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 849, italics in original.
[42]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 845, footnote omitted.
[43]*Adoption of Kelsey S., supra,* 1 Cal.4th at pages 846-847.

mother or through receiving the child into his home and holding it out as his own. Either method was ultimately in the control of the mother. She could refuse to marry the father and she could deny him the right to take the child into his home.[44] The court noted a would-be presumed father, thwarted in his efforts by the mother, could resort to the courts for a custody order. But because such an order was discretionary and could be frustrated by the mother or third parties, the court held its availability did not equalize the father's ability to refuse consent to adoption with the mother's ability to do so.[45]

"The anomalies under this statutory scheme [are] readily apparent," the court stated. "A father who is undisputably ready, willing, and able to exercise the full measure of his parental responsibilities can have his rights terminated merely on a showing that his child's best interest would be served by adoption. If the child's mother, however, were equally of the opposite character—*un*ready, *un*willing, and *un*able—her rights in the child could nevertheless be terminated only under the much more protective standards [of showing unfitness by clear and convincing evidence]. Such a distinction bears no substantial relationship to protecting the well-being of children. Indeed, it has little rationality."[46]

The court also asserted the system leads to "irrational distinctions" between fathers.[47] "Based solely on the mother's wishes, a model father can be denied presumed father status, whereas a father of dubious ability and intent can achieve such status by the fortuitous circumstance of the mother allowing him to come into her home, even if only briefly—perhaps a single day. . . . Under the statutory scheme, two fathers who are by all accounts equal in their ability and commitment to fulfill their parental missions can be treated differently based solely on the mothers' decisions whether to allow the father to become a presumed father."[48]

Finally, the court found the statutory scheme "largely ignore[s]" the child's best interest. "A child may have a wholly acceptable father who wants to nurture it, but whose parental rights can be terminated . . . because the mother has precluded the father from attaining presumed father status. Conversely, if a presumed father is highly questionable in every respect, he

---

[44]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 847. A third avenue to presumed fatherhood, not available when *Adoption of Kelsey S.* was decided, is a joint declaration of paternity under section 7574. That method too, however, requires the mother's cooperation.

[45]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 847.

[46]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 847.

[47]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 847.

[48]*Adoption of Kelsey S., supra,* 1 Cal.4th at pages 847-848. It appears the court misspoke when it referred to the mother allowing the father into "her home." The statute requires the father to take the child into "*his* home." (§ 7611, subd. (d), italics added.)

is nevertheless allowed to withhold consent absent proof by clear and convincing evidence that he is unfit."[49]

The Supreme Court remanded the matter to the trial court to determine whether Rickie had "demonstrated a sufficient commitment to his parental responsibilities" to satisfy the "holding out" element of presumed fatherhood and, if so, to permit him to withhold his consent to Kelsey's adoption unless the trial court found him an unfit parent.[50]

In *In re Zacharia D.* the court noted extending *Adoption of Kelsey S.* to dependency proceedings would allow a father who is precluded from attaining presumed father status by the mother or a third party "to participate as a 'parent' in, or end the need for, the dependency proceedings."[51] Given the facts in *In re Zacharia D.*, however, the court stopped short of applying *Adoption of Kelsey S.* to a dependency proceeding.[52]

*Adoption of Kelsey S.* was subsequently extended to dependency proceedings by the Court of Appeal in *In re Julia U.*[53] In that case, the appellate court reversed the trial court's orders denying a father reunification services and terminating his parental rights. The facts showed the would-be presumed father did not receive Julia into his home because by the time he learned he might be the child's father a dependency petition had been filed and Julia was already in DCFS custody. Nevertheless, the appellate court concluded from the evidence that once on notice father demonstrated a full commitment to his parental responsibilities as defined in *Adoption of Kelsey S.* and therefore "his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent."[54]

Although *In re Julia U.* undoubtedly reached the correct result the opinion does not explain why the constitutional analysis in *Adoption of Kelsey S.* should apply to dependency cases. We believe a brief explanation is appropriate.

Important similarities exist between the adoption procedures at issue in *Adoption of Kelsey S.* and the dependency procedures at issue in the present

---

[49]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 848.

[50]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 850.

[51]*In re Zacharia D., supra,* 6 Cal.4th at page 451.

[52]The court found Zacharia's father failed to demonstrate any parental commitment to Zacharia and was not precluded from attaining presumed father status by the mother or a third party. (*In re Zacharia D., supra,* 6 Cal.4th at p. 451.)

[53]*In re Julia U.* (1998) 64 Cal.App.4th 532 [74 Cal.Rptr.2d 920].

[54]*In re Julia U., supra,* 64 Cal.App.4th at pages 540-541.

case. Paternal rights may be terminated in both proceedings and in both proceedings the mother or a third party may preclude the father from obtaining presumed fatherhood status.[55] Furthermore, the important governmental interest in both proceedings is the well-being of the child.[56]

The constitutional issues in both proceedings also are similar. In the adoption scheme at issue in *Adoption of Kelsey S.* only mothers and presumed fathers had the right to withhold consent to adoption.[57] In the dependency scheme at issue in the present case, only mothers and presumed fathers have the right to reunification services.[58] In both adoption and dependency proceedings, the issue is whether the state's important interest in the well-being of the child is substantially furthered by the practice of allowing the mother or a third party to deny a committed father the opportunity to become a "presumed father" with the same statutory rights as the mother.[59] We find this practice no more rational in the dependency context than it was in the adoption context.

Like the facts in *Adoption of Kelsey S.*, the facts in this case demonstrate a man who has established a loving, nurturing parental relationship with a child can be denied presumed father status because, through no fault of his own, he cannot physically bring the child into his home either because the mother, the DCFS, the hospital or a combination of all three have made it impossible for him to do so.[60] We recognize there is a possible way around a mother's roadblock. The father may be able to obtain a foster care license and then petition the court to place his child in his foster home thereby satisfying the statutory requirement of receiving the child "into his home."

---

[55]*In re Zacharia D., supra,* 6 Cal.4th at page 451.

[56]*Adoption of Kelsey S., supra,* 1 Cal.4th at pages 844-845. Compare Welfare and Institutions Code, section 202, subdivision (d) ("[j]uvenile courts and other public agencies charged with enforcing, interpreting, and administering the juvenile court law shall consider . . . the best interests of the minor in all deliberations pursuant to this chapter"). See also Welfare and Institutions Code section 202, subdivision (a) (the purpose of dependency proceedings "is to provide for the protection . . . [of] each minor child under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare" and "[w]hen removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective").

[57]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 825.

[58]Welfare and Institutions Code section 361.5, subdivisions (a), (b); *In re Zacharia D., supra,* 6 Cal.4th at page 451.

[59]Compare *Adoption of Kelsey S., supra,* 1 Cal.4th at pages 844-845.

[60]As the court noted in *Adoption of Kelsey S., supra,* 1 Cal.4th at page 845, footnote 11, the fact the actions of the mother or some third person prevented the father from becoming a statutorily presumed father does not mean their actions stemmed from some evil motive. For example, when the baby is born with cocaine in its bloodstream, custody by the hospital and then by DCFS is certainly not blameworthy even though its unintended consequence is to prevent an otherwise qualified father from attaining statutorily presumed father status.

This circuitous route to presumptive fatherhood, however, does not cure the constitutional defect in the statutory scheme. A foster care license may be denied for reasons which have nothing to do with the father's commitment to his parental responsibilities.[61] Even if the father obtains a foster care license he has no right to have the child placed with him. And further, requiring some fathers to obtain foster care licenses in order to gain presumed father status places a burden on them not borne by mothers or by fathers who have not been prevented from taking their children into their homes.

Again, as in *Adoption of Kelsey S.*, "the anomalies under this statutory scheme are readily apparent." A father like J.R. who is undisputably ready, willing and able to exercise his parental responsibilities is denied the right to family reunification services leading to eventual termination of the dependency proceedings and custody of his child while a mother who is *un*ready, *un*willing and *un*able to exercise her parental responsibilities in most cases has a statutory right to those services.[62] We fail to see how such a distinction bears any rational relationship to the government's interest in the child's well-being.[63]

For these reasons it is plain to us that at least with respect to biological fathers section 7611 and the related dependency scheme violate the federal constitutional guarantees of equal protection and due process to the extent they allow a mother or third person unilaterally to preclude the father from becoming a "presumed father" where he promptly comes forward and demonstrates as well as he can under the circumstances a full commitment to his parental responsibilities—emotional, financial and otherwise.

---

[61]As noted above, J.R. took and completed training as a foster parent but was denied a license because he did not have his own home. Ironically, assisting J.R. to obtain a suitable residence for him and Jerry would be part of the family reunification services J.R. was denied.

[62]We are not arguing such a mother should be *denied* reunification services anymore than the Supreme Court in *Adoption of Kelsey S.* was arguing a mother should *not* have the right to refuse consent to her child's adoption. The remedy in both situations is to put the father on a par with the mother, not vice versa.

[63]It could be argued J.R. lacks standing to raise this constitutional objection because he had no home into which he could receive Jerry. Such an argument fails for two reasons. J.R. was not homeless. He resided at the Midnight Mission in Los Angeles and, although Jerry could not reside at the Mission with him, the statute does not require the child to reside in the father's home but only be "received" into the home. Compare *Adoption of Kelsey S., supra,* 1 Cal.4th at pages 847-848, suggesting even a brief visit to the father's home would be enough to satisfy the statutory requirement of receiving the child into his home. There is no evidence J.R. could not have brought Jerry to his home for visits had the DCFS allowed him to do so. Indeed, counsel for DCFS went to great pains at the hearing on J.R.'s presumed father status to elicit evidence J.R. could not have snuck off with Jerry to the Mission during one of his monitored visits and thereby attained statutory presumed father status. Furthermore, the foster mother told the trial court if necessary she would offer her home to J.R. so he could have a place to live with Jerry.

J.R. is not Jerry's biological father, however. He is what might best be described as an "equitable father."[64] Thus, we turn to the question whether the constitutional rights of biological fathers recognized in *Adoption of Kelsey S.* should extend to equitable fathers such as J.R..

## IV. *J.R. Has a Constitutionally Protected Interest in Maintaining His Parental Relationship with Jerry.*

DCFS argues *Adoption of Kelsey S.* protection should not extend beyond biological fathers but offers no reasons or case authority to support its position. Nevertheless, we recognize a colorable argument can be made in defense of this view.

Such an argument would begin by pointing out the *Adoption of Kelsey S.* opinion itself contains numerous references to the right of a biological father to form a relationship with his child. For example, the court cites the United States Supreme Court's opinion in *Lehr v. Robertson*[65] as "recogniz[ing] the uniqueness of the biological connection between parent and child."[66] The court then quotes *Lehr*'s statement, " '[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring,' " arguably implying only biological fathers are entitled to the constitutional protection afforded by its opinion.[67] In discussing the best interest of the child, the court again emphasizes the importance of the biological connection between father and child. "The child has a genetic bond with its natural parents that is unique among all relationships the child will have throughout its life."[68] In its holding the court also refers to the biological connection between father and child, stating the adoption scheme at issue is unconstitutional to the extent "the statutes allow a mother unilaterally to preclude her child's

---

[64]Some might refer to J.R. as a "Horton father" after the hero of Dr. Seuss's Horton Hatches The Egg (1940). (See *In re Emily R.* (2000) 80 Cal.App.4th 1344, 1355 [96 Cal.Rptr.2d 285]; *In re Ariel H.* (1999) 73 Cal.App.4th 70, 74-75 [86 Cal.Rptr.2d 125].) Horton, it will be recalled, sat on an egg in a nest for nearly a year while the baby bird's mother enjoyed herself in Palm Beach. Horton protects the egg from frost, rain, and human interference. He comes to think of the egg as his. Just as the egg is about to hatch, the mother bird returns. She demands Horton give the egg back but "at that very instant, the egg burst apart." To everyone's amazement, the baby bird has ears, a tail and a trunk. The crowd of bystanders unanimously agrees the baby is Horton's, reasoning "it should be, it should be, it SHOULD be like that! Because Horton was faithful! He sat and he sat!" Horton, we note, did not receive the egg into his home but sat on it in the nest in the tree where the mother bird left it.

[65]*Lehr v. Robertson* (1983) 463 U.S. 248 [103 S.Ct. 2985, 77 L.Ed.2d 614].

[66]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 837.

[67]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 837, quoting *Lehr v. Robertson, supra,* 463 U.S. at page 262 [103 S.Ct. at page 2993].

[68]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 848.

biological father from becoming a presumed father . . . ."[69] One could argue, therefore, it is not invidious discrimination to provide reunification services to a biological father who has never lived with his child but deny those services to an otherwise similarly situated nonbiological father.

*Troxel v. Granville*[70] also lends some support to the DCFS's argument. In *Troxel*, the court struck down on due process grounds a Washington statute which allowed " 'any person [to] petition the court for visitation rights at any time.' "[71] Under the statute, Granville, a single mother, was required to permit her children's paternal grandparents to visit the children on a schedule imposed by the trial court. The Supreme Court held the visitation order made pursuant to the statute, "was an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody and control of her two daughters."[72] It could be argued if a mother's fundamental right to make decisions about the custody and control of her child trumps any interest the biological grandparents have in developing a relationship with the child it certainly trumps any interest an unrelated individual has in developing a parental relationship with the child. In some cases the mother may have a perfectly good reason for not allowing the would-be presumed father to take the child into his home—the home may be a crack house or the man may have been convicted or suspected of child molestation, or the mother simply may not want the man to establish a relationship with the child when she knows he is not the biological father.

Finally, it is always possible to argue complex political, practical and social considerations, such as the rights of nonbiological "fathers," should be left to the Legislature.[73]

We find these arguments unpersuasive for the reasons given below.

While *Adoption of Kelsey S.* and *Lehr v. Robertson* contain references to the importance of the biological relationship between a father and his child we do not find those references determinative. Both cases *involved* biological fathers and so it was only natural the courts would discuss that biological connection in explaining the reasons for their decisions. ▇ As the *Adoption of Kelsey S.* opinion itself reminds us, " ' "It is the general rule that the language of an opinion must be construed with reference to the facts

---

[69]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 849.

[70]*Troxel v. Granville* (2000) 530 U.S. 57 [120 S.Ct. 2054, 147 L.Ed.2d 49].

[71]*Troxel v. Granville, supra,* 530 U.S. at page 67 [120 S.Ct. at page 2061], italics omittted.

[72]*Troxel v. Granville, supra,* 530 U.S. at page 72 [120 S.Ct. at page 2063].

[73]See e.g., *Sharon S. v. Superior Court* (2001) 93 Cal.App.4th 218, 226-227 [113 Cal.Rptr.2d 107]; *In re Marriage of Lewis & Goetz* (1988) 203 Cal.App.3d 514, 519-520 [250 Cal.Rptr. 30].

presented by the case, and the positive authority of a decision is coextensive only with such facts." ' . . ."[74]

Neither *Adoption of Kelsey S.* nor *Lehr* addressed the interests of a nonbiological "father" in developing or maintaining a relationship with the child nor did they compare those interests to the interests of a biological father. Neither case, therefore, provides authority for limiting *Adoption of Kelsey S.* protections to biological fathers.

On the other hand, in *Smith v. Organization of Foster Families* the United States Supreme Court observed: "No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship."[75] For this reason, the court concluded, a foster parent has at least a "limited constitutional 'liberty' [interest]" in maintaining her relationship with the foster child.[76] If a foster parent has a liberty interest in maintaining his or her relationship with a foster child, a fortiori a man who has made the kind of parental commitment to a child J.R. has made also has a liberty interest in maintaining his relationship with the child.

*Troxel v. Granville* does not call into question J.R.'s liberty interest in maintaining his relationship with Jerry. The court in *Troxel* noted "there is no allegation that Granville ever sought to cut off [the grandparents'] visitation entirely."[77] In contrast, the statutory scheme at issue here allows not only mothers but other third parties to cut off reunification and custody entirely. Furthermore, as the court explained in *Adoption of Kelsey S.*, whatever the reason behind the mother's decision to prevent the man in question from becoming a presumed father it "does not provide a *legal* basis on which to determine" the father's rights.[78] We are confident the juvenile court will not permit visitation or custody with a presumed father who is a convicted child molester or lives in a crack house.

The argument complex political, practical and social issues should be left to the Legislature was answered in *Dawn D. v. Superior Court* where Justice Werdegar explained: "[I]f the judiciary is to fulfill its role in our tripartite system of government as the final arbiter of constitutional issues, it cannot hope to escape the tension between legislative policy determinations and the

---

[74]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 828, citations omitted.

[75]*Smith v. Organization of Foster Families* (1977) 431 U.S. 816, 844 [97 S.Ct. 2094, 2109-2110, 53 L.Ed.2d 14].

[76]*Smith v. Organization of Foster Families, supra,* 431 U.S. at page 846 [97 S.Ct. at pages 2110-2111].

[77]*Troxel v. Granville, supra,* 530 U.S. at page 71 [120 S.Ct. at pages 2062-2063].

[78]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 845, footnote 11.

challenges raised by those who would seek exceptions thereto. We can, however, while entertaining such challenges, seek to hold the tension in check by always presuming the constitutional validity of legislative acts and resolving doubts in favor of the statute."[79]

 Here, our Supreme Court has already made the decision the statutory scheme for determining presumed father status is constitutionally flawed "to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father . . . ."[80]

Our task is limited to determining whether the holding in *Adoption of Kelsey S.* should apply to men who are not biological fathers. The issue is one of standing: does a nonbiological father have a constitutionally sufficient interest in his relationship with the child to be entitled to reunification services on the same basis as a *"Kelsey S.* father"? The issue is not whether nonbiological fathers who have never lived with their children are inviduously discriminated against in the provision of reunification services vis-à-vis biological fathers who have never lived with their children. J.R. does not contend *Adoption of Kelsey S.* itself creates an unconstitutional classification. Rather, the issue is whether a nonbiological father may have a sufficient liberty interest in his relationship with the child to have standing to challenge the "irrational" statutory scheme identified in *Adoption of Kelsey S.*

For the reasons set forth below, we hold *Adoption of Kelsey S.* protection should extend to men such as J.R. who have demonstrated their commitment to parental responsibility by meeting the conditions set forth in that opinion, none of which depends on biology.

In explaining the reasons for our holding, it bears repeating there is no requirement in section 7611, subdivision (d) the presumed father be the biological father. The statute simply states a man becomes a presumed father if he "receives the child into his home and openly holds out the child as his natural child." Thus, there are possibly hundreds if not thousands of nonbiological presumed fathers carrying out parental responsibilities today.

More importantly, the conditions for protection under *Adoption of Kelsey S.* do not depend on biology. Rather, a man is entitled to protection from invidious discrimination in attempting to attain presumed father status if (1)

---

[79]*Dawn D. v. Superior Court, supra,* 17 Cal.4th at page 939. We note in this regard the public policy in California is tending in the direction of recognizing the right to a parent-child relationship should be based on conduct rather than blood. See e.g., sections 297, 9000, subdivision (f) facilitating "second parent" adoption by the domestic partner of the biological mother. (Stats. 2001, ch. 893, §§ 3, 5.)

[80]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 849, italics omitted.

once he "knows or reasonably should know of the pregnancy, he . . . promptly attempt[s] to assume his parental responsibilities as fully as the mother will allow and his circumstances permit,"[81] and (2) "is indisputably ready, willing, and able to exercise the full measure of his parental responsibilities . . . . [¶] . . . [¶] . . . emotional, financial, and otherwise."[82] As discussed above, J.R. clearly meets these requirements.

We are also mindful of the legislative command we consider "the best interests of the minor in all deliberations" under the dependency law.[83] In our view, it is decidedly *not* in the best interest of the child to deny a man who has been part of the child's life since before birth and who meets all the other requirements stated above the opportunity "enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development"[84] simply because more than a year after birth a blood test shows the man is not the child's father.

As adults we must not forget what every child knows—the parent-child relationship is not spun from DNA.[85] Rather, it stems from the emotional attachments which derive from the intimacy of contact between the parent and child—" 'the countless gestures, large and small, that repeatedly reaffirm: I see you, I love you; I am yours, you are mine.' "[86]

## DISPOSITION

The order denying J.R. reunification services is reversed and the cause is remanded for further proceedings consistent with the views expressed in this opinion.[87]

Woods, J., concurred.

---

[81]*Adoption of Kelsey S., supra,* 1 Cal.4th at page 849.

[82]*Adoption of Kelsey S., supra,* 1 Cal.4th at pages 847, 849.

[83]Welfare and Institutions Code section 202, subdivision (d).

[84]*Lehr v. Robertson, supra,* 463 U.S. at page 262 [103 S.Ct. at page 2993].

[85]*In re Ariel H., supra,* 73 Cal.App.4th at page 75.

[86]*In re Ariel H., supra,* 73 Cal.App.4th at page 75, quoting from Smolowe, *Baby Knows Best: Parenthood Is Made of More Than Genetic Material* (Aug. 17, 1998) Time, at page 66.

[87]After we filed this opinion DCFS requested us to dismiss the appeal as moot. While the appeal was pending the trial court issued an order terminating parental rights. DCFS maintains this order is now final, no appeal having been taken, and there is no relief we can afford J.R. at this stage of the proceedings. (Cf. *In re Jessica K.* (2000) 79 Cal.App.4th 1313 [94 Cal.Rptr.2d 798].) We do not know why J.R. did not seek to stay proceedings in the trial court or appeal the termination order. We do know determinations of presumed fatherhood are common in dependency proceedings yet, as the procedural history of this case shows, capable of evading review. Furthermore, the public policy behind uniting families and giving a child a father even if he is not the biological father make this case a case of great public importance. We also note DCFS did not raise the mootness issue until after it lost the appeal. In its request for dismissal DCFS is cagey about when it learned of the termination order, saying only it was "recently informed" of the order. For these reasons we will not dismiss the appeal as moot.

**PERLUSS, J.,** Concurring and Dissenting.—I concur in part II of the majority's opinion, holding as a matter of statutory interpretation that a finding of nongenetic paternity does not necessarily defeat presumed father status under Family Code section 7611, subdivision (d).[1] I also agree in general with much of the analysis in part III.B., holding that in appropriate cases the constitutional rights of unwed biological fathers recognized in *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*) extend to dependency proceedings—at least insofar as those proceedings involve the potential termination of the father's parental rights. (See *In re Zacharia D.* (1993) 6 Cal.4th 435, 450-451 [24 Cal.Rptr.2d 751, 862 P.2d 751].)[2] However, I respectfully dissent from the judgment reversing the order denying J.R. reunification services in this case because I believe substantial evidence supports findings by the juvenile court that demonstrate J.R. failed to satisfy the standard set forth in *Kelsey S.*

1. *The juvenile court found J.R. failed to come forward promptly in the dependency proceedings*

The indispensable prerequisite for a finding that a man is a *Kelsey S.* father is that, both before and after birth, he "promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit." (*Kelsey S., supra,* 1 Cal.4th at p. 849.) For *Kelsey S.* to be applied in the dependency context, the father must "come[] forward early in the dependency process." (*In re Zacharia D., supra,* 6 Cal.4th at p. 451 [father who did not appear until 18-month review hearing under Welf. & Inst. Code, § 366.22 failed to demonstrate commitment consistent with the standard set forth in *Kelsey S.*].)

As discussed in the majority's opinion, J.R. had daily contact with Jerry at the hospital in the period immediately following his birth. However, in denying J.R.'s request for reunification services, the juvenile court found

---

[1]This issue is currently pending before our Supreme Court in *In re Nicholas H.* (2001) 91 Cal.App.4th 86 [110 Cal.Rptr.2d 126], review granted November 14, 2001, S100490.

[2]The majority holds in part III, as did Division Six of our court in *In re Julia U.* (1998) 64 Cal.App.4th 532 [74 Cal.Rptr.2d 920], that a *Kelsey S.* father has a constitutional right to reunification services. Subsequent to the Supreme Court's decision in *In re Zacharia D., supra,* 6 Cal.4th at pages 447-451, which considered but did not decide that issue, the Legislature amended Welfare and Institutions Code section 361.5, subdivision (a), to authorize the juvenile court to provide reunification services for a biological father who is not a statutorily presumed father, including a *Kelsey S.* father, "if the court determines the services will benefit the child." (Stats. 1997, ch. 793, § 17.) For the reasons discussed in the text, I do not believe this is an appropriate case in which to address whether the Legislature's distinction between a statutorily presumed father's unconditional right to services (subject to exceptions listed in Welf. & Inst. Code, section 361.5, subd. (b)) and a *Kelsey S.* father's right to request such services in the best interests of the child offends either the federal or state Constitutions.

that J.R., although aware of the pending dependency case, failed to come forward promptly: The court specifically found J.R. had received appropriate notice for the disposition hearing held on February 2, 1999, but did not appear in court until the June 1, 1999 hearing pursuant to Welfare and Institutions Code section 366.26, some four months later. In concluding that J.R. significantly delayed his appearance in the dependency proceedings, the juvenile court necessarily found the factual predicate for applying *Kelsey S.* was absent,[3] even assuming it could be extended to this type of case under appropriate circumstances.

### 2. *The juvenile court's findings are supported by substantial evidence*

The juvenile court's findings are reviewed under the substantial evidence standard. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1226-1227 [69 Cal.Rptr.2d 380].) Those findings cannot be disturbed if there is any solid, credible evidence in favor of the ruling, giving benefit to every reasonable inference in favor of the prevailing party and resolving all conflicts in support of the court's ruling. (*Ibid.*)

" 'In reviewing the sufficiency of the evidence, our review requires that all reasonable inferences be given to support the findings and orders of the juvenile court and the record must be viewed in the light most favorable to those orders. [Citation.] Those findings and orders may not be disturbed if they are supported by substantial evidence. [Citations.] As stated: "Issues of fact and credibility are questions [of fact] for the trial court, not this court. [Citation.] 'The rule is clear that the power of the appellate courts begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' [Citation.]" [Citation.]' " (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733-734 [7 Cal.Rptr.2d 60].)

Under this deferential standard, the findings underlying the juvenile court's denial of reunification services to J.R. should be affirmed. Those findings are supported not only by the evidence of J.R.'s four-month delay in appearing in the dependency proceedings, emphasized in the juvenile court's ruling, but also by evidence before the court that J.R. had initially refused to cooperate in the dependency case by providing his residence address to

---

[3] The *Kelsey S./In re Zacharia D.* requirement that the father promptly come forward in dependency proceedings and J.R.'s failure to do so were expressly argued by counsel for Los Angeles County Department of Children and Family Services (DCFS) at the initial hearing before the referee as a ground for denying reunification services. Judge Nash, who heard the matter de novo following the grant of the rehearing petition, read the transcript of the prior hearing and took judicial notice of its contents. In addition, Jerry's counsel urged at the de novo hearing that the court order family reunification services under an expanded application of *Kelsey S.*

DCFS, failed to attend or cancel a scheduled visit with Jerry in December 1998 and in January 1999, following telephone contact with DCFS, failed to keep an appointment with the social worker to discuss Jerry's situation.

3. *In light of the juvenile court's findings, it is unnecessary to reach the constitutional issue raised by J.R.*

Because I would affirm the juvenile court's orders based on its factual determinations, I need not resolve the difficult constitutional issue at the core of the majority opinion: Whether an individual who is neither the child's biological father nor a statutorily presumed father but who has nonetheless demonstrated a strong commitment to parenting the child has a constitutional right to reunification services even though the Legislature has declined to provide for such services.[4]

Were I to consider that question, however, I would want to address at least the following issues, not all of which are fully discussed in the majority's opinion:

(1) In light of the Legislature's creation of a *statutory* category of "presumed fathers" in Family Code section 7611, subdivision (d) that does not require a direct genetic relationship with the child, what is the significance, if any, of such a relationship to the required *constitutional* analysis? Is it arbitrary or irrational to provide reunification services to a biological father who has demonstrated his commitment to parenting but has never lived with his child while denying such services to an otherwise similarly situated nonbiological "father"? In this regard, I would necessarily consider the language from the United States Supreme Court's decision in *Lehr v. Robertson* (1983) 463 U.S. 248, 262 [103 S.Ct. 2985, 2993, 77 L.Ed.2d 614], referred to in the majority's opinion, that "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring." (See also *Kelsey S., supra,* 1 Cal.4th at p. 844 ["a biological father has a constitutionally cognizable opportunity interest in developing a relationship with his child"].)

(2) The statutory scheme considered constitutionally impermissible in *Kelsey S.* was one that differentiated between the rights of a child's biological *father* and his or her biological *mother* regarding termination of parental

---

[4]Even if such an "equitable father" has no constitutional right to reunification services, he may nonetheless have a constitutionally cognizable interest sufficient to require notice of the dependency proceedings and the right to be represented and to present evidence at hearings at which the status of the dependent child is at issue. (Compare Cal. Rules of Court, rule 1412(e) [recognizing rights of de facto parents to participate in dependency hearings] with *In re Jody R.* (1990) 218 Cal.App.3d 1615, 1628 [267 Cal.Rptr. 746] [de facto parents are not entitled to reunification services].)

rights. (*Kelsey S., supra*, 1 Cal.4th at p. 849 [the statutory scheme at issue "violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest"].) Even assuming an "equitable father" has some cognizable constitutional interest in developing a relationship with the child (cf. *Smith v. Organization of Foster Families* (1977) 431 U.S. 816, 846 [97 S.Ct. 2094, 2110-2111, 53 L.Ed.2d 14] [recognizing foster parent has a limited constitutional interest in his or her relationship with a foster child]), how does *Kelsey S.*'s finding of invidious discrimination between the rights of a biological father and those of a biological mother affect the definition, extent and limits of the "equitable father's" rights?

(3) If the conditions for protection under *Kelsey S.* do not depend on a direct genetic relationship, is there any more justification for them to depend on the man's "openly hold[ing] out the child as his *natural* child," rather than simply recognizing the child openly as his "daughter" or "son"? If the answer to that question is "no," then does the constitutional reach of *Kelsey S.* inevitably extend to stepparents, de facto parents[5] and other nongenetically related individuals (e.g., foster parents) who want to parent the child? Is it within our purview to so expand the scope of mandatory reunification services, or is that a matter for the Legislature?

I recognize, as does the majority, that the constitutional issue raised by J.R. is of great significance to possibly hundreds, if not thousands, of men actively carrying out parental responsibilities. Nonetheless, I feel constrained to wait for what I consider a factually appropriate case before offering my own views as to the proper resolution of these questions. (Cf. *In re Zacharia D., supra*, 6 Cal.4th at p. 451 [deferring decision whether *Kelsey S.* should be extended to dependency proceedings because father failed to satisfy *Kelsey S.* criteria].)

A petition for a rehearing was denied February 27, 2002, and the opinion was modified to read as printed above.

---

[5]A de facto parent is a person "who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Cal. Rules of Court, rule 1401(a)(8).)