Filed 5/4/16  In re Juliana J. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JULIANA J., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br>　　　Plaintiff and Respondent, <br><br>v. <br><br>JESSE J., <br><br>　　　Defendant and Appellant. | A146292 <br><br>(Humboldt County <br>Super. Ct. No. JV150136) |

　　　Juliana J. (Juliana) was born with multiple health problems because her mother, Rebecca D. (Mother), abused drugs during the pregnancy.  Juliana's presumed father, Jesse J. (Father), became aware of Mother's substance abuse issues about six months earlier, and had not been involved with Mother since then.  After investigation, the Humboldt County Department of Health and Human Services (Department) filed a dependency petition on behalf of Juliana pursuant to Welfare and Institutions code section 300.[1]

　　　Following a contested dispositional hearing, the dependency court denied Father's request that Juliana be placed with him.  The dependency court found that under section 361.2, which governs placement with a noncustodial parent after a child has been

---

[1] All further statutory references are to the Welfare and Institutions Code.

removed from her custodial parent or parents (here, Mother), placing Juliana with Father would be detrimental to her safety, protection or physical or emotional wellbeing.

On appeal, Father contends for the first time that he was a custodial parent and that pursuant to section 361, subdivision (c), Juliana should not have been removed from his custody. Father also argues that even if he was not a custodial parent, and even if therefore section 361.2 is the correct governing statute, the dependency court's finding that Juliana would suffer detriment from being placed with him is not supported by substantial evidence. Finding no error, we will affirm the dispositional order.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2015, Rebecca D. (Mother) gave birth to Juliana J. Juliana was born prematurely, and as a result of Mother's abuse of drugs while pregnant, Juliana suffered withdrawals,[2] respiratory distress, tremors and other problems. She was transferred to a neonatal intensive care unit, where she remained for almost six weeks.

Mother tested positive for benzodiazepines and tricyclic antidepressants at the time of Juliana's birth, had a history of abusing opiates and other controlled substances that included multiple overdoses, and had attempted suicide not long before she became pregnant with Juliana. Mother had overdosed on opiates and muscle relaxers during the fourth month of the pregnancy, and had been driving under the influence of opiates and other drugs when she was involved in a car accident about a week before Juliana's birth.

In light of Mother's use of drugs throughout the pregnancy and the positive toxicology results on both Mother and Juliana, the hospital's social services department contacted Child Welfare Services shortly after Juliana was born.

A.    *Initial Proceedings*

The day after Juliana's birth, a social worker from the Department met with Mother and Jesse J., who Mother stated was Juliana's father (Father). There is no evidence in the record that Father was involved in Mother's prenatal care or that he was

---

[2] On the day of her birth, Juliana exhibited signs of neonatal abstinence syndrome, that is, withdrawal after exposure to drugs while in utero. She was treated with morphine, from which she was weaned after about a month.

present at Juliana's birth. Father said that he and Mother had gotten together more than a year earlier, but had not been a couple since he became aware of Mother's substance abuse issues. He said he had no tolerance for that and had tried to help her, but she would not accept his help. He and Mother had ended their relationship in about January 2015. Father said he wanted to participate in parenting Juliana, that he and mother planned to co-parent using Mother's house as a permanent residence for the child, and that he was ready to assume full care of Juliana if necessary. Father agreed to sign a declaration of paternity.

Two days later, the Department filed a dependency petition on behalf of Juliana pursuant to section 300, alleging serious physical harm under subdivision (a), arising from Mother's abuse of opiates and other drugs during pregnancy, and failure to protect under subdivision (b), arising from Mother's current substance abuse, her history of substance abuse while denying substance abuse, and her mental health issues.

A detention hearing was held the next day, at which Father was present and represented by counsel. At the hearing, Father, who was listed as "alleged" in the dependency petition, was found to be Juliana's presumed father. When the dependency court stated that Juliana had been removed from her parents' care, Father's counsel corrected the dependency court: "It should just be the mother, your Honor." The Department's counsel added, "The child has never been in the care of the father. He's non-custodial." Father made no objection or other response to that statement, and the Detention Findings and Orders include a finding that the child was removed from the home of her mother. At the detention hearing, Father's counsel reported that Father was seeking release of the child to his care, and that Father, who had previously said he would not allow Child Welfare Services to assess the safety of his home for Juliana to be released into his care, was now amenable to having them "come to his home and assess him fully" to that end.

The dependency court ordered continued detention of Juliana, with Mother and Father each having visitation at least twice weekly for at least two hours per visit, and scheduled a jurisdiction hearing. In August, at the pretrial conference for the jurisdiction

3

hearing, Mother and Father stipulated to jurisdiction. Counsel for Father informed the court once again that Father sought placement of the child, who was still in the hospital. A contested dispositional hearing was scheduled for September.

B.     *Dispositional Hearing*

In advance of the dispositional hearing, the Department submitted a disposition report to the dependency court, recommending that Juliana be declared a dependent of the court and be placed with a foster family, with the parents to receive reunification services.

The report stated that as a result of her intrauterine exposure to drugs, Juliana was at risk for delayed growth and development, and was very demanding and at times "inconsolable." She needed a care provider who is "extremely patient and can hold her for long periods of time." The report summarized Father's criminal history, including a 2009 conviction for cultivating and manufacturing marijuana and conspiring to launder money, for which Father was sentenced to six years in prison. Father was on supervised release at the time the report was prepared; his parole officer reported to the Department that Father was facing water diversion charges and, if convicted, might return to federal prison.

The dispositional hearing took place over two days.[3] By that time, Juliana had been released from the hospital, and was living with a relative of Mother. Social worker Broch Heidebrecht (Heidebrecht) testified that Juliana needed to be fed about every two hours, and that it took an hour to feed her between half an ounce and an ounce of formula. The longest she had slept was four hours, but that was not the norm. She needed to be held 23 to 24 hours per day. Juliana had to see an ophthalmologist because

---

[3] When Father failed to appear at the scheduled dispositional hearing on September 9, his attorney requested a continuance until the next day, which was granted. The Department requested that its single witness, a social worker who was not available the next day, be examined right then; that request was also granted. Father, the only other witness, testified on September 10.

one of her eyes was "not tracking." She also had weekly appointments with a pediatrician for tremors and fussiness.

Heidebrecht testified that Father visited Juliana eight times during her 40 days in the hospital, that the time had not been tracked for all the visits, but one was 10 minutes, one was 20 minutes, and one was about an hour. Since the release from the hospital, Father had visited seven times for two hours each, and missed one visit. Father arrived for the first visit "smelling strongly of marijuana." During those seven visits, he helped change Juliana once, and fed her once.

Father testified that his stepson, then 11 years old, had lived with him for a time starting when he was 10 months old, and that Father had experience changing diapers and taking care of a small child by himself. He had also lived with his son, then 8 years old, from the time of his birth until he was three and a half. He testified that he lived in a two-bedroom house with a roommate, that the child would live in his bedroom with him, and that he could have a crib and supplies ready for the child in three hours.

He testified that if Juliana was placed in his care, he would be the primary caretaker, with assistance from his mother and a friend, and that if a background check determined that the friend was not suitable to care for the child, he would exclude her as a caregiver. He testified that he would be available to care for the child at least three to four days per week full time. He said he did excavations for a living, and that his work would not be affected if he was up all night caring for Juliana. He testified that he would ensure that any contact between Juliana and Mother was supervised, that he would be the supervisor if that was allowed, and that if Mother arrived for a visit under the influence, he would "remove her from the situation," by "contact[ing] her mother or hav[ing] somebody take her away."[4]

---

[4] Father had previously told the Department that he was unwilling to turn Mother away if she came to his house to see the child, and that if he was required to do that, "then maybe the baby should just go to a foster home." He also told the Department that he might hide the baby somewhere in Shelter Cove.

He testified that he was aware that Juliana had special medical needs. Asked about these needs, he said, "I'm not exactly sure, but the feeding schedule is quite different being—being that she's premature." Father was not aware of any issues with Juliana's eye, or any special needs other than her feeding schedule. He never asked the hospital personnel to discuss Juliana's special needs with him. He had not attended any of Juliana's doctor's appointments, but was willing to take her to appointments at least once a week and was willing to work with a public health nurse to learn about Juliana's specific needs.

He testified that since Juliana was released from the hospital he had attended all scheduled visits but one, which was cancelled at the last minute and rescheduled for a day he could not attend. He testified that he visited for two hours each time, holding Juliana, changing her diaper, rocking her, watching her sleep, and feeding her.

He also testified that he felt that Child Welfare services was "being intrusive in [his] life without reason," that he would not be willing to work with Child Welfare Services if Juliana was put in his care, that he told the social worker he was not willing to talk with him or work with him, and that if the court placed Juliana with him and ordered him to engage in a case plan that required him to communicate with the social worker and allow the social worker to visit his home, he would not be willing to do that. He was later asked whether he would be willing to comply with court orders requiring him to have contact with the social worker in connection with services being provided to Mother, and responded, "Minimal, if at all." Asked whether he would be willing to work with a different social worker, he responded, "Possibly."

At the conclusion of Father's testimony, the dependency court heard argument from the attorneys for Mother, Father and Juliana, all of whom argued that Juliana should be placed with Father, as well as argument from the Department's attorney.

The dependency court stated that there was no question that Juliana was a special needs child, who needed care essentially around the clock, and that there were good reasons for Child Welfare Services to be involved when a child is born who is detoxing from controlled substances. While expressing understanding of Father's hostility to the

6

Department, the dependency court said that Father had to be willing to engage with the Department for Juliana's benefit. The dependency court found clear and convincing evidence that there would be a risk to Juliana if she were placed with Father, emphasizing that Father had not talked to nurses or professionals in the hospital to learn about his child's needs, or engaged with the social worker; that father was not adequately aware of the child's needs, including the eye issues; and that Father's unwillingness to work with Child Welfare Services, whom Father viewed as being intrusive without reason, showed "an unwillingness to acknowledge the state that this child is in when this child is born, and her particular needs. There is a real good reason why those workers are there." The dependency court also noted Father's unwillingness to comply with conditions regarding supervised visitation with the Mother, and Father's not attending Juliana's medical appointments.

The dependency court found that Father was a parent with whom Juliana was not residing at the time of the events that brought her within the provisions of section 300, who desired to assume custody, and that placement with the noncustodial parent at that time would be detrimental to the child. The court ordered the Department to provide family reunification services to Mother and Father, and ordered the parties, including Father, to comply with the terms of the case plan.[5]

This appeal timely followed.

## DISCUSSION

A. *Applicable Law*

A dependency court's acquisition of jurisdiction over a child is governed by section 300. In its jurisdictional order, the dependency court found that Juliana was described by section 300, subdivision (a), which applies when a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian," and subdivision (b),

---

[5] The case plan identified just two responsibilities for Father: demonstrate knowledge of parenting special needs child through interactions with the child and communication with the social worker; and contact social worker at least once per month.

7

which applies when a child "has suffered or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

Section 361, subdivision (c)(1) authorizes the court to remove a child from "the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated [if] the juvenile court finds clear and convincing evidence [that] . . . [¶] . . . [t]here is or would be substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (*See In re Luke M.* (2003) 107 Cal.App.4th 1412, 1420 (*Luke M.*).)

"Section 361.2, subdivision (a) governs placement of a child after the dependency court has acquired jurisdiction of a child. The section provides: 'When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. *If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.*' (Italics added.) (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1420.)

"A court's ruling under section 361.2, subdivision (a) that a child should not be placed with a noncustodial, nonoffending[6] parent requires a finding of detriment by clear and convincing evidence. [Citation.] We review the record in the light most

---

[6] Section 361.2 does not include the word "nonoffending." "Nonetheless, '[i]n a few decisions, reviewing courts have used the phrase "nonoffending noncustodial parent" as shorthand for "a parent . . . with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of section 300." ' [Citations.]" (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 299; see *Luke M.*, *supra*, 107 Cal.App.4th at p. 1426 [using the phrase "noncustodial, nonoffending parent"].)

favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that the child[ ] would suffer such detriment. [Citations.] Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt. [Citation.]" (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.) "Substantial evidence is evidence that is reasonable, credible and of solid value, such that a reasonable trier of fact could make such findings." (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1507, citing *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) The "appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value or, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. . . . It is not an appellate court's function, in short, to redetermine the facts." (*In re Sheila B.*, *supra*, 19 Cal.App.4th at pp. 199-200.)

"A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm." (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.) The dependency court's inquiry focuses on the child's best interests. (*Ibid.*)

B.     *Father Has Forfeited His Claim that the Dependency Court Applied the Wrong Statute*

Father argues that the dependency court erred in finding that he was a noncustodial parent, and in applying section 361.2 in deciding whether to place Juliana with him. He contends that as a presumed father he (as well as Mother) had custody of Juliana at the time of her birth, and that because he was a custodial parent, the dependency court could not remove the child from his custody without a finding of abuse or neglect as required by section 361, subdivision (c). The Department argues that Father has forfeited his right to this claim of error because he did not raise it below. We agree with the Department.

It is a general principle of appellate review that "issues raised for the first time on appeal which were not litigated in the trial court are waived." (*Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11.) This principle holds for dependency cases. (*In re John*

9

*M.* (2013) 217 Cal.App.4th 410, 419 [parent's failure to raise placement under section 361.2 in dependency court forfeits the issue]; *In re A.A.* (2012) 203 Cal.App.4th 597, 605 [same].) Here, Father concedes that he never claimed to have custody of Juliana at any point in the proceedings below, and never objected to being characterized as a noncustodial parent. Father was represented by counsel at the detention hearing, at the hearing where Mother and Father stipulated to jurisdiction, and at the dispositional hearing, and never argued that the dependency court should apply section 361 to his claim that Juliana should be placed with him. To the contrary, Father's counsel explicitly argued that the court should award Father sole physical custody under section 361.2.

We decline Father's invitation to exercise our discretion to view the dependency court's application of section 361.2 as a "pure issue of law" that can be raised for the first time on appeal. Father's argument on this issue rests on *In re D'Anthony D., supra,* 230 Cal.App.4th 292. The issue in that case was whether section 361.2 requires that a noncustodial parent be "nonoffending" to be considered for placement, such that sustained jurisdictional allegations against a noncustodial parent sufficed to preemptively deny that parent consideration for custody without assessing detriment to the child under section 361.2.[7] (*Id.* at p. 301.) As an issue of statutory interpretation, that was a "pure issue of law." (*Id.* at p. 298, fn 2.) Here, in contrast, Father questions the correctness of the dependency court's factual finding that he was a noncustodial parent. If Father had raised this issue below, the Department could have addressed it, and the dependency court could have ruled on it with an adequate record and argument, which are lacking here.

At the same time he concedes that the application of section 361.2 rests on the dependency court's factual finding that he was a noncustodial parent, Father argues that section 361.2 does not apply here as a matter of law. We reject these arguments. Father

---

[7] The Court of Appeal held that there is no such requirement, and that due process requires a detriment finding by clear and convincing evidence before a noncustodial parent can be denied placement under section 361.2. (*In re D'Anthony D., supra,* 230 Cal.App.4th at p. 301.)

cites *In re Zacharia D.* (1993) 6 Cal.4th 435, 439 (*Zacharia D.*) for the proposition that section 361.2 "applies only when the child is first removed from the custodial parent's home." He argues that Juliana was in the hospital from the time of her birth until the petition was filed, and therefore was not residing with either parent, and concludes from this that she was not removed from a parent's home and that section 361.2 does not apply to Juliana. This argument is meritless. It rests on a misreading of *Zacharia D.*, which addressed the issue of whether a biological but nonpresumed father was entitled to custody of a child under section 361.2 twenty months after the child was removed from the custody of his mother and presumed father. (*Ibid.*) In *Zacharia D.*, our Supreme Court concluded that section 361.2 applies only *at the time* that the child is first removed from the parent's custody, and does not apply after 20 months have passed. (*Id.* at pp. 453-454.) There is no basis for Father's apparent reading of *Zacharia D.* as holding that section 361.2 applies only in situations where a child has been physically removed directly from the home of a custodial parent.

We are not persuaded by Father's contention that "[a]s a presumed father he shared equal custody with Mother at Juliana's birth," from which Father suggests that he is a custodial parent as a matter of law. As an initial matter, Father presents no evidence or argument to suggest that he was a presumed father at the time of Juliana's birth. To the contrary, he had "alleged" father status when Juliana was first detained on July 7 and when the section 300 petition was filed on July 9; he was not elevated to presumed status until the detention hearing on July 10. Moreover, Father's contention rests on Family Code section 3010, subdivision (a), which states, "The mother of an unemancipated minor child and the father, if presumed to be the father under Section 7611, are equally entitled to the custody of the child." Father offers no response to the Department's commonsense observations that Family Code section 3010 concerns the rights of the parent to be considered for custody by the Family Court, and that being entitled to seek custody is not equivalent to having custody.

What is more, the three cases that Father cites to support his contention are inapposite. *In re Baby Girl M.* (1984) 37 Cal.3d 65, 72 stands for the proposition that for

an adoption to proceed, both the mother and the presumed father must give consent, unless their parental rights have been terminated.  It does not support Father's statement that he had custody of Juliana at the time of her birth.  *Zacharia D.*, *supra*, 6 Cal.4th at page 439 holds that "a presumed father is a 'parent' entitled to reunification services with and/or custody of his child under the applicable statutory sections," but that does not mean that Father had custody of Juliana at the time of her birth.  Rather, the "applicable statutory sections"—including section 361.2—govern the extent to which he is entitled to custody and/or to reunification services, which the dependency court has ordered here.  *In re E.W.* (2009) 170 Cal.App.4th 396, 399 has nothing to do with presumed fathers. There, a newborn and its older sibling were removed from their parents' custody after the mother and the newborn tested positive for drugs in the hospital.  (*Ibid.*)  The case says nothing about presumed fathers, and it does not stand for the proposition that any newborn who is detained in a hospital is necessarily taken from the custody of two parents.[8]

Because we conclude that Father has forfeited his claim that the dependency court should have evaluated his request for custody of Juliana under section 361, we do not reach his arguments that the dependency court failed to make the required findings under section 361, subdivisions (c) and (d).

---

[8] After citing these three cases, Father quotes at length from *In re Isayah C.* (2004) 118 Cal.App.4th 684, 699 (*Isayah C.*), but does not explain the relevance of the quotation.  *Isayah C.* concerns a father who had been granted joint custody in a previous dependency proceeding, which is not the case here.  (*Id.* at p. 688.)  In that case there was "a lack of factual clarity" as to whether the father was a custodial or noncustodial parent, because the child's "primary physical custodian changed rather rapidly," and the record was unclear as to whether the dependency court had applied section 361 or 361.2 in denying the father's request for custody.  (*Id.* at p. 699.)  In any event, it does not follow from *Isayah C.* that section 361, subdivision (c) "should apply in this case because both parents had custody of Juliana who was not living with either parent at the time the petition was filed."

C. *Substantial Evidence Supports the Dependency Court's Finding of Detriment under Section 361.2*

Father argues that the evidence before the dependency court was insufficient to support its conclusion that there was clear and convincing evidence that placement with Father would be detrimental to Juliana's safety, protection, or physical or emotional well-being. (§ 361.2, subd. (a).) We disagree.

The record shows that Juliana was born prematurely and had been exposed to drugs in utero, and that as a result she had special needs. At birth she showed symptoms of neonatal abstinence syndrome. She was transferred to a neonatal intensive care unit, treated with morphine to manage her withdrawals, and spent almost six weeks in the hospital. Even after her release, she was irritable, experienced tremors, had difficulties feeding, and required holding for 23 to 24 hours per day. She needed to be fed every two hours, and could take an hour to ingest less than one ounce of formula. She was considered at risk for delayed growth and development, had an eye problem that required the care of a specialist, and had weekly appointments with a pediatrician for her tremors and fussiness.

Juliana was two months old by the time of the dispositional hearing. Yet Father had never sought information about Juliana's needs, nor attended medical appointments where he would have learned about those needs. He was not aware of any of the difficulties that Juliana faced, apart from her feeding schedule, which he attributed to her being premature, and did not express understanding of any of her needs, other than being held, fed, and diapered.

Father had been, and remained, unwilling to work with the service providers who participated in Juliana's care. Initially, he would not allow the Department to evaluate the safety of his home, and he told the Department that he would not comply with its instructions regarding Mother's visits with Juliana. His cooperation with service providers did not significantly improve: he declined to sign a case plan, he refused to talk or work with Department representatives, he testified that he was not willing to work with Child Welfare Services if Juliana was placed in his care, and he testified that if

Juliana was placed with him subject to court orders, his compliance with those orders would be "minimal, if at all."

On this record, where Juliana needed essentially round-the-clock care and monitoring and evidenced difficulties arising from more than just being born prematurely, and where Father showed no awareness of Juliana's special needs apart from her feeding schedule, had not sought information about the child's needs, had declined to work with Child Welfare Services, and expressed unwillingness to work with Child Welfare Services in the future, we see no error in the dependency court's concluding that there was clear and convincing evidence of detriment to Juliana, if she were placed with Father. As the dependency court stated, "I don't think there is a close call as far as clear and convincing evidence in this particular case. . . . [¶] . . . [Father] needs to demonstrate the willingness to engage and the willingness to move forward and acknowledge that this is a special needs child that's going to take more than changing a few diapers and feeding. It's going to take a lot more than that."

## DISPOSITION

The dependency court's dispositional order is affirmed.

_____
Miller, J.

We concur:

_____
Kline, P.J.


_____
Stewart, J.

A146292, *Humboldt County Department of Health and Human Services v. Jesse J.*